871 F.2d 368
 130 L.R.R.M. (BNA) 3035, 111 Lab.Cas. P 11,094,
27 Fed. R. Evid. Serv. 1311
 UNITED STATES of America
v.
Stephen TRAITZ, Jr.
Appeal of Stephen TRAITZ, Jr., Appellant in No. 88-1048.
Appeal of Robert CROSLEY, Appellant in No. 88-1049.
Appeal of Michael DALY, Appellant in No. 88-1050.
Appeal of Michael MANGINI, Appellant in No. 88-1055.
Appeal of Mark "Buddy" OSBORN, Appellant in No. 88-1056.
Appeal of Stephen TRAITZ, III, Appellant in No. 88-1057.
Appeal of Joseph TRAITZ, Appellant in No. 88-1058.
Appeal of Richard SHOENBERGER, Appellant in No. 88-1059.
Appeal of Robert MEDINA, Appellant in No. 88-1071.
Appeal of Daniel J. CANNON, Appellant in No. 88-1152.
Appeal of Ernest WILLIAMS, Appellant in No. 88-1153.
Appeal of Edward HURST, Appellant in No. 88-1154.
Appeal of James NUZZI, Appellant in No. 88-1155.
 Nos. 88-1048 to 88-1050, 88-1055 to 88-1059, 88-1071 and
88-1152 to 88-1155.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 29, 1988.
Decided March 22, 1989.
Rehearing and Rehearing In Banc Denied in Nos. 88-1048,
88-1049, 88-1050, 88-1055, 88-1056, 88-1057,
88-1058, 88-1059, 88-1152, 88-1153,
88-1154, 88-1155 April 21, 1989.
Rehearing Denied in No. 88-1071 April 21, 1989.
 
 Edward J. Daly, Law Offices of Edward J. Daly, Philadelphia, Pa., for appellant Michael Daly.
 Thomas Bergstrom (argued), Philadelphia, Pa., for appellants Michael Mangini, Ernest Williams and Edward Hurst.
 Steven A. Morley, Morley & Farber, Philadelphia, Pa., for appellant Mark "Buddy" Osborn.
 Stephen Robert LaCheen, Anne M. Dixon, Stephen Robert LaCheen & Associates, Philadelphia, Pa., for appellants Stephen Traitz, III, Joseph Traitz and Richard Shoenberger.
 Creed C. Black, Jr., (argued), Kathy Yourkowski, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., for appellant Robert Medina.
 Ronald F. Kidd (argued), Teresa N. Cavenagh, Duane, Morris & Heckscher, Philadelphia, Pa., for appellant Stephen Traitz, Jr.
 Robert E. Madden, Philadelphia, Pa., for appellant Robert Crosley.
 Jack A. Meyerson (argued), Philadelphia, Pa., for appellant Daniel J. Cannon.
 Dennis H. Eisman (argued), Philadelphia, Pa., for appellant James Nuzzi.
 Edward S.G. Dennis, Jr., U.S. Atty., Walter S. Batty, Jr., Asst. U.S. Atty., Chief of Appeals, Richard L. Scheff (argued), Asst. U.S. Atty., Chief, Corruption, Labor Section, Ronald K. Noble, Asst. U.S. Atty., for appellee U.S.
 Before GIBBONS, Chief Judge, SEITZ, Circuit Judge, and FARNAN, District Judge.*
 OPINION OF THE COURT
 SEITZ, Circuit Judge.
 
 
 1
 On October 23, 1986, appellants Stephen Traitz, Jr. ("Traitz, Jr."), Edward P. Hurst ("Hurst"), Michael Mangini ("Mangini"), Robert Crosley ("Crosley"), Michael Daly ("Daly"), Daniel Cannon ("Cannon"), Mark Osborn ("Osborn"), Robert Medina ("Medina"), Ernest Williams ("Williams"), James Nuzzi ("Nuzzi"), Stephen Traitz, III ("Traitz, III"), Joseph Traitz ("Traitz"), Richard Schoenberger ("Schoenberger") and six other individuals were indicted. On June 18, 1987, the grand jury returned a sixty-six count superseding indictment which charged violations of the Racketeer Influenced Corrupt Organization Act ("RICO"), RICO conspiracy, mail fraud, solicitation of kickbacks to influence the operation of an employee benefit plan, embezzlement from an employee welfare plan, Hobbs Act extortion, collection of credit and claims by extortionate means, interstate travel in aid of racketeering and embezzlement of union funds in contravention of 18 U.S.C. Secs. 1962(c), 1962(d), 1341, 1954, 664, 201, 1951, 894, 1952 and 29 U.S.C. Sec. 501(c), respectively.
 
 
 2
 Appellants were tried and convicted on various counts of the superseding indictment and duly sentenced. This appeal followed.
 
 I. JURISDICTION
 
 3
 The district court had jurisdiction based on alleged violations of federal criminal statutes. We have jurisdiction pursuant to 28 U.S.C. Sec. 1291 (1982).
 
 II. BACKGROUND
 
 4
 Due to the complex nature of this appeal we outline the structure of this opinion. After setting forth both a factual overview and, in a general way, the facts relating to the specific charges, those arguments that were raised in common by several appellants will be resolved. Thereafter, the contentions asserted by individual appellants that are unique to their circumstances will be determined.
 
 
 5
 On September 23, 1985, listening devices and the interception of communications in the Business Manager's Office and Business Agent's Meeting Room at the offices of the Roofers Union Local 30/30B were authorized. Electronic surveillance continued through February 26, 1986. The fruits of this surveillance and other material eventuated in the indictments and convictions here involved.
 
 A. MAIL FRAUD
 
 6
 Appellants Medina and Traitz, Jr. were found guilty of mail fraud in violation of 18 U.S.C. Secs. 1341 and 1342. The facts concerning this charge are as follows. On June 21, 1985, Medina, while operating an automobile leased for him by the Roofers Union, was involved in a hit-and-run accident. After the accident, Medina took the vehicle to the outskirts of Philadelphia and set it on fire. Medina and Traitz, Jr. then, using the mails, reported to their insurance carrier that the car had been stolen resulting in a payment of $18,075.00 by the insurance company.
 
 B. BRIBERY AND KICKBACKS
 
 7
 On October 16, 1985, Medina was arrested on Pennsylvania state charges for aggravated assault in connection with the motor vehicle accident of June 21, 1985. Thereafter, conversations were intercepted in which Traitz, Jr. said that he was going to "buy Medina out of trouble" and was going to get the "right" judge for the case. When Medina was released on his own recognizance, Traitz, Jr. acknowledged having "arranged" for Medina's release with the Bail Commissioner Margaret McCook. Later, Traitz, Jr. gave $300 to Philadelphia Police Officer John McCook, the husband of the Bail Commissioner, and said to John McCook, "give that [the $300] to your wife."
 
 
 8
 In addition, a conversation on November 11, 1985, among Traitz, Jr., Crosley, Hurst and Mangini, was intercepted in which the men were discussing giving "Christmas" envelopes, containing cash, to various public officials. This discussion was followed by several conversations in November in which Traitz, Jr. and other individuals created the procedure by which the "gifts" were to be made. In order to assure secrecy, the "gift" envelopes would not contain the names of the recipients but would bear a number of hash marks corresponding to the total number of hundreds of dollars contained in the envelope.
 
 
 9
 On December 6, 1985, Traitz, Jr. met with Tommy Brown. Traitz, Jr. gave Brown 21 envelopes and a list of names of the public officials to whom the envelopes were to be delivered, including how large a "gift" each person was to receive. On December 17, 1985, Brown reported to Traitz, Jr. that he had delivered 19 of the 21 envelopes; Brown returned the undelivered envelopes to Traitz, Jr. Other public officials traveled to the offices of the Roofers Union to collect the "gifts" intended for them. In addition, appellant Nuzzi traveled from Pennsylvania to New Jersey to deliver "gifts" to Sheriff William Simon of Camden, New Jersey and his Deputy, Norbert Zuchowski.
 
 C. OSHA BRIBERY
 
 10
 Evidence presented at trial established that Traitz, Jr. gave Bernard J. Dillon ("Dillon"), Area Director of the Occupational Safety and Health Administration (OSHA), money in return for various favors. Dillon engaged in inspections of non-union job sites in order to harass the non-union employers and assisted, at the request of Traitz, Jr., a retired Philadelphia Police Officer to fill out an employment application for OSHA containing false information.
 
 
 11
 D. HOBBS ACT EXTORTION AND COLLECTION OF CREDIT BY EXTORTIONATE MEANS
 
 
 12
 Beginning in September, 1985, Local 30B contractors (also called "principals") were summoned to the offices of the Roofers Union. The purpose of the meetings was to institute a "new policy" and to "request" principals to pay fines for noncompliance with union rules. The new policy required principals to report at least 100 hours of work per month (the "100 hour plan"), thereby mandating a minimum union payment of $60, in contrast to the previous policy which did not contain a minimum reporting requirement. In addition, non-union contractors were summoned to the union offices to induce them to become union-contractors.
 
 
 13
 The meetings with the contractors were shown to be confrontational and intimidating in that the principals were often threatened and physically abused by union officials--typically the union business agents who were ex-amateur or ex-professional boxers.III. DISCUSSION
 
 A. COMMON ARGUMENTS
 
 14
 1. Facial Sufficiency of the October 24, 1985 Order
 
 
 15
 The October 24, 1985 order (the "Order"), authorizing electronic surveillance of the Business Manager's Office and the Business Agents Meeting Room of the Roofers Union, was the second of five interception orders signed by the district judge then having responsibility for such matters. On appeal, there is no argument regarding the validity of the other four surveillance orders. The Order, however, was missing page three when it was signed by the district judge. Appellants claim that it was error for the district court to refuse to suppress the fruits of the electronic surveillance during the period when the Order was in effect.
 
 
 16
 The discrete question presented on appeal is whether the absence of page three and the information that would have been contained therein, renders the Order facially insufficient and therefore invalid under 18 U.S.C. Sec. 2518(10)(a)(ii)[1]. Appellants contend that the Order was deficient in that the requirements of Sec. 2518(3)(c) and (d) as well as Sec. 2518(4)(d) were not satisfied requiring the suppression of the fruits of the Order. We will examine the merits of each of these contentions in turn.
 
 
 17
 a. Requirement that Sec. 2518(3) Findings be in Writing
 
 
 18
 Under 18 U.S.C. Sec. 2518(5) "[e]xtensions of an order may be granted, but only upon ... the court making the findings required by subsection (3) of this section." Subsection (3) of 18 U.S.C. Sec. 2518 provides in pertinent part:
 
 
 19
 Upon application the judge may enter an ex parte order ... if the judge determines on the basis of the facts submitted by the applicant that--
 
 
 20
 * * *
 
 
 21
 * * *
 
 
 22
 (c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous;
 
 
 23
 (d) there is probable cause for belief that the facilities from which, or the place where, the wire or oral communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense ...
 
 
 24
 The findings required to be made pursuant to 18 U.S.C. Sec. 2518(3)(c) and (d) were not set forth in writing. Appellants contend that these findings must be set forth in writing for the order to be valid. The appellants argue that it is only through written findings that a reviewing court can be satisfied that a district court has complied with the statutory mandate.
 
 
 25
 Section 2518(3) authorizes a judge to issue an ex parte order permitting electronic surveillance after the judge determines,[2] inter alia, that normal investigative procedures have been tried and failed or appear unlikely to succeed if attempted or are too dangerous and that probable cause exists to believe that the place at which electronic surveillance is to be conducted is being used in connection with an offense. Nothing in the language of this section compels the judge to set forth the required findings in writing.[3] As one court stated: "[t]here is nothing in Sec. 2518(3)(c) which requires that particular words be used in the requisite finding or indeed that the finding be actually expressed in words rather than by act of the judge." United States v. Tortorello, 342 F.Supp. 1029, 1036 (S.D.N.Y.1972), aff'd, 480 F.2d 764 (2d Cir.1973), cert. denied, 414 U.S. 866, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973). See also, United States v. Escandar, 319 F.Supp. 295, 304 (S.D.Fl.1970) ("Section 2518(3) requires only that the authorizing judge make a determination that normal investigative procedures have been tried and appear likely to fail. There is no specific mandate that such determination be reflected in the written order.").
 
 
 26
 Based on the language of the statute, we can conclude that the judge's act of signing the Order is sufficient evidence that the judge made the findings required under Sec. 2518(3) of the statute.[4] Appellants, however, ask this Court to look beyond the language of the statute and find that overriding policy considerations warrant requiring the findings to be put into writing. Appellants urge this Court to find that it is only through written findings that a proper review of the district court's decision to allow electronic surveillance can be had. Appellants liken this to the requirement that a court make specific written findings of fact in order to comply with Rule 52(a) of the Federal Rules of Civil Procedure.
 
 
 27
 Appellants' argument is without merit. In this case, in order to review the district court's decision to enter an ex parte order allowing electronic surveillance this Court need only look to the affidavit which was presented to the district court in support of the government's application. This in fact is the practice that has developed. See United States v. Martinez, 588 F.2d 1227 (9th Cir.1978); United States v. Armocida, 515 F.2d 29 (3d Cir.), cert. denied, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975). Thus, it cannot be said that the findings of fact required to be made pursuant to Sec. 2518(3) must be made in writing in order for an appellate court to have a "clear understanding of the trial court's judgment." See Feely v. United States, 337 F.2d 924, 935 (3d Cir.1964).
 
 
 28
 This conclusion becomes all the more apparent when one examines the other four electronic surveillance orders in which the district court set forth its findings in writing. In each of these four orders the district court's findings simply tracked the language of Sec. 2518(3)(a)-(d). Such bald recitations do little to aid this Court in assessing the propriety of the district court's order. Instead, requiring the district court to set forth its findings in writing would promote form over substance and would create a requirement, amounting to a trap for the unwary, where none was apparently on the mind of Congress. See e.g., S.Rep. No. 1097, 90th Cong., 2d Sess. 11 reprinted in 1968 U.S.Code Cong. & Admin.News pp. 2112, 2153.
 
 
 29
 Nevertheless, appellants ask this Court to draw upon precedent in the federal immunity context and find a requirement that the district court place its findings in writing. In relevant part, 18 U.S.C. Sec. 6003 provides that a United States Attorney may request an immunity Order from the district court immunizing a witness if in "his [the United States Attorney's] judgment--(1) the testimony or other information from such individual may be necessary to the public interest; and (2) such individual has refused to testify or provide other information on the basis of his privilege against self-incrimination." Although not mandated by the statute, it has been held that the findings of the United States Attorney must be made explicitly. United States v. Herman, 589 F.2d 1191, 1201 (3d Cir.1978), cert. denied, 441 U.S. 913, 99 S.Ct. 2014, 60 L.Ed.2d 386 (1979); In re Bart, 304 F.2d 631, 635 (D.C.Cir.1962).
 
 
 30
 Appellants contend that this establishes that important statutory findings should not be left to inference. Notwithstanding the merits of requiring a United States Attorney to set forth statutory findings explicitly in the immunity context,[5] we decline to adopt such an approach where, as here, such a requirement is not mandated by the statute and where policy considerations actually disfavor such an an approach.
 
 
 31
 Finally, appellants argue that the missing recitations reveal that the district court impermissibly "rubber stamped" the request of the government for electronic surveillance. United States v. Ford, 553 F.2d 146, 165-166 (D.C.Cir.1977). Appellants claim that the district judge's signature on an order which was missing a page indicates that the judge had not carefully reviewed the order and that this requires invalidation of the order.
 
 
 32
 Appellants' contention, although superficially attractive, is analytically flawed. In examining whether the judge properly performed his function it is not the order which must be examined but rather the application and the affidavit which were submitted in support of the interception order. United States v. Ford, 553 F.2d at 169; United States v. Ventresca, 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965) ("Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police.").
 
 
 33
 In the instant case, there is no suggestion on appeal that the affidavit submitted by the government in support of electronic surveillance was improper. Thus, examining the words in the proper light, we cannot conclude that the district court "rubber stamped" the government's request without exercising its independent judgment.
 
 
 34
 b. Requirements of 18 U.S.C. 2518(4)
 
 
 35
 Section 2518(4) provides in pertinent part:
 
 
 36
 (4) Each order authorizing or approving the interception of any wire or oral communication under this chapter shall specify--
 
 
 37
 * * *
 
 
 38
 * * *
 
 
 39
 (d) the identity of the agency authorized to intercept the communications, and of the person authorizing the application;
 
 
 40
 Appellants claim that the Order is facially defective because it fails to identify either the investigating agency or the Department of Justice official who authorized the application for electronic surveillance. It should be noted that each of the other four surveillance orders stated:
 
 
 41
 Wherefore, it is on this [date] ... Ordered that Special Agents of the Federal Bureau of Investigation, United States Department of Justice are authorized pursuant to the application provided by Honorable Stephen S. Trott.
 
 
 42
 A two tiered analysis must be employed to review appellants' claim. First, this Court must determine if the Order was facially deficient. If we find that the Order was defective in some manner, we must examine the defect to determine if it is merely a technical defect which would not require suppression of the evidence obtained from the electronic surveillance. United States v. Acon, 513 F.2d 513, 517 (3d Cir.1975).
 
 
 43
 In this case, the Order cannot be considered to have been facially defective. First, the Order effectively identifies the FBI as the agency authorized to intercept identifies the FBI as the agency authorized to intercept oral communications. Page six of the Order states "the Bell Telephone Company of Pennsylvania shall furnish the Federal Bureau of Investigation such information, facilities and assistance as are necessary to accomplish the oral interception...." As the district court concluded: "Logic dictates that if the order directs the Bell Telephone Company to assist the FBI with the interception, then the FBI is the agency authorized to intercept."
 
 
 44
 Second, the Order sufficiently identifies the person authorizing the application. 18 U.S.C. Sec. 2516 provides in relevant part that:
 
 
 45
 "[t]he Attorney General, Deputy Attorney General, Assistant Attorney General, any Assistant Attorney General, any acting Attorney General, or any Deputy Assistant Attorney General in the Criminal Division specially designated by the Attorney General, may authorize an application to a Federal Judge ... [for] an order authorizing or approving the interception of wire or oral communications by the Federal Bureau of Investigation ..."
 
 
 46
 In the instant case, page four of the Order states that the: "Assistant Attorney General, Criminal Division, United States Department of Justice, who has been designated by the Attorney General of the United States to exercise the power conferred upon him by Section 2516, Title 18, United States Code ..." The necessary inference from the above quoted passage of the Order is that the Assistant Attorney General of the Criminal Division was in fact using the power granted him by the Attorney General and was authorizing the application for an electronic surveillance order. It makes little difference in law that the person authorizing an application for interception was identified by title rather than by name. Cf. United States v. Camp, 723 F.2d 741, 744 (9th Cir.1984) (Attorney General complies with Sec. 2516(1) when he specially designates an Assistant Attorney General by job title rather than by name).
 
 
 47
 Even if, arguendo, it can be said that the Order failed to adequately make the relevant identifications, these omissions are properly viewed as technical defects not warranting suppression of the evidence discovered as a result of the electronic surveillance. In United States v. Acon, 513 F.2d 513, 518 (3d Cir.1975) this Court stated: "suppression is not required for facial insufficiency relating to less critical requirements which may be varied by subsequent affidavits. The identification directives [of Sec. 2518(4)(d) ] in our opinion fall within this category. In such a situation, suppression will not be required where there was substantial compliance with the statute." Id. See United States v. Vento, 533 F.2d 838, 861 (3d Cir.1976). It must be recognized that "Sec. 2518(4))(d) 'requires that the order note the agency authorized to make the interception and the person who authorized the application so that responsibility will be fixed.' " S.Rep. No. 1097, 90th Cong., 2d Sess., 101 (1968), quoted in, United States v. Chavez, 416 U.S. 562, 572, 94 S.Ct. 1849, 1854-55, 40 L.Ed.2d 380 (1974).
 
 
 48
 In determining whether there was substantial compliance with the statute we may look beyond the face of the order to the facts as they actually existed in order to determine if there was compliance with the substantive requirements of the statute. United States v. Acon, 513 F.2d at 518. In Acon, for example, an unauthorized person signed the application for electronic surveillance. This Court, however, accepted affidavits, which were first presented at the suppression hearing, from both the unauthorized person and the Attorney General showing that the Attorney General had actually authorized the application. Id. at 514. This Court found that the Attorney General's actual approval of the wiretap was substantial compliance with the statute. Id. at 519.
 
 
 49
 In the instant case the application for the Order and the accompanying affidavit reveal substantial compliance with the statute. The application and the accompanying affidavit reveal numerous references to the FBI as the agency that will conduct the electronic surveillance. Moreover, the application states that: "Pursuant to Section 2516 of Title 18 of the United States Code, the Assistant Attorney General of the Criminal Division, the Honorable Stephen S. Trott, having been specifically designated by the Attorney General of the United States ... has approved the application for an order authorizing the interception of oral communications." Thus, there can be no question that Stephen Trott, a person specifically designated by the Attorney General,[6] actually authorized the application for electronic surveillance. Moreover, the purpose of the statutory rule, accountability, has not been undermined because both the agency undertaking the surveillance and the party authorizing the application for surveillance are clearly identified. See United States v. Chavez, 416 U.S. 562, 572, 94 S.Ct. 1849, 1854-55, 40 L.Ed.2d 380 (1974). Under either or both of the approaches the requirements of 18 U.S.C. Sec. 2518(4) were satisfied.
 
 2. Hobbs Act Extortion
 
 50
 Counts twenty-four through forty-one of the superseding indictment charged nine of the thirteen appellants with Hobbs Act violations, 18 U.S.C. Sec. 1951.[7] These charges stemmed, inter alia, from the appellants' participation in the "100 hours" program described above. All of the nine persons charged were found guilty of at least one count of Hobbs Act extortion.
 
 In pertinent part, the Hobbs Act provides:
 
 51
 (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned for not more than twenty years or both.
 
 
 52
 "Extortion" is defined in the Act as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence or fear...." 18 U.S.C. 1951(b)(2).
 
 
 53
 At trial appellants objected to several parts of the judge's charge to the jury on the Hobbs Act counts. The district judge instructed the jury that four elements must be satisfied before it can find appellants in violation of the Hobbs Act. The court stated:
 
 
 54
 In order to meet its burden of proving that the defendants committed extortion under the Hobbs Act, the Government must prove each of the following elements:
 
 
 55
 First, that the defendants induced or attempted to induce others to part with their property;
 
 
 56
 Second, that the defendants did so with the victims' consent, but that this consent was compelled by the wrongful use or threat of force, violence or fear;
 
 
 57
 Third, that interstate commerce or an item moving in interstate commerce was delayed, obstructed or affected in any way or degree; and
 
 
 58
 Fourth, that the defendants acted knowingly and willfully.
 
 
 59
 The appellants do not challenge the district judge's general recitation of the essential elements of the Hobbs Act but rather contend that the district judge erred in his instructions on the appellants' defense theories. We review the district judge's charge to "determine whether the charge, taken as a whole and viewed in the light of the evidence, fairly and adequately submits the issues in the case to the jury." Link v. Mercedes-Benz of North America, 788 F.2d 918, 922 (3d Cir.1986). We will address appellants' three challenges to the district court's charge seriatim.
 
 
 60
 a. Wrongfulness of Threat or Use of Force
 
 
 61
 In United States v. Enmons, 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973), striking workers committed acts of violence against their employer's property in pursuit of higher wages and other benefits. Id. at 398, 93 S.Ct. at 1009. On these facts, the Supreme Court held that an alleged extortionist could not be convicted under the Hobbs Act for violence related to union activity aimed at obtaining property to which s/he had a lawful claim. The basis for this holding is the fact that such conduct is not "wrongful" as that term is used in the Hobbs Act. Thus, in Enmons the Supreme Court found that an alleged extortionist must not only employ an unlawful means but must act in pursuit of an unlawful end.
 
 
 62
 Appellants claim that the jury charge on the Hobbs Act was in error because the judge told the jury that the Enmons defense hinged on whether the collective bargaining agreement authorized the "100 hours" plan. That is to say, the district court's test for whether the union had a lawful claim to the proceeds of the 100 hours program turned on the terms of the collective bargaining agreement. Thus, the discrete question presented on appeal is whether it was appropriate, in this case, for the district court to use the collective bargaining agreement as the polestar for determining wrongfulness.[8]
 
 
 63
 We conclude that the collective bargaining agreement was the correct test and that the district court's charge on the Enmons defense was therefore proper. In United States v. Russo, 708 F.2d 209 (6th Cir.), cert. denied, 464 U.S. 993, 104 S.Ct. 487, 78 L.Ed.2d 682 (1983), the Sixth Circuit was forced to determine if the appellants, an officer and an employee of the J & J Cartage Company, had acted "wrongfully" as that term is used in the Hobbs Act. In that case the Company and the Teamsters Union entered into a collective bargaining agreement which provided, in relevant part, that the Company would make the necessary contributions to the employees' union Health and Welfare Fund. Thereafter, the Company, without renegotiating the collective bargaining agreement, imposed an 11% "service charge" on the employees to cover the Company's contribution to the benefits plan. The court concluded that the Company had no lawful claim to the service charge because the existing collective bargaining agreement "expressly required the Company to make payments to the welfare and pension funds out of the Company's own funds." Id. at 215. Thus, Russo stands for the proposition that "Enmons does not apply to the extraction of payments in violation of the collective bargaining agreement because there could be no lawful claim to that property." United States v. Jones, 766 F.2d 994, 1002 (6th Cir.1985), citing, United States v. Russo, 708 F.2d at 215. See also, United States v. Cusmano, 729 F.2d 380, 382 (6th Cir.) cert. denied, 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984) (same facts and same result as Russo ).
 
 
 64
 In this case, as in Russo, the violent acts of the appellants were not perpetrated either during a strike or during an attempt to modify a collective bargaining agreement. Viewed in the best light, the appellants' violent actions were taken to enforce an unwritten union policy. In such a circumstance, the only way in which the appellants' conduct can arguably be said to be insulated from Hobbs Act liability is for the actions to have been taken in pursuit of property to which they were entitled under the collective bargaining agreement. See United States v. Russo, 708 F.2d 215; United States v. Cusmano, 729 F.2d at 382. Thus, examining the jury charge in the light of the evidence, the Enmons defense was fairly and adequately submitted by the court to the jury.
 
 
 65
 b. Advice of Counsel Defense
 
 
 66
 In September, 1985 the advice of an attorney, Bernard N. Katz, was sought regarding the implementation of the 100 hours program. At trial, appellants sought to prove that they relied on Katz's legal advice that the 100 hours program was legitimate. Thus, the appellants contended at trial that because they relied on the advice of counsel they were entitled to an acquittal on the Hobbs Act counts.[9]
 
 
 67
 The district judge's charge to the jury on the advice of counsel defense included the following language: "you must determine whether the defendants relied in good faith on the lawyer's advice after full disclosure to him of all the material facts about how they [appellants] would conduct themselves in the union's conference room." Appellants claim that this charge was in error because it required that the appellants receive their lawyer's advice on the manner in which they conducted themselves in the union's conference room. Appellants contend that so long as they received the advice of counsel on the legitimacy of the end sought, i.e. the collection of the proceeds of the 100 hours program, then under Enmons the means used to obtain these funds becomes irrelevant.[10]
 
 
 68
 Appellants' contention is meritless. The advice of counsel defense, "based on good faith reliance on an attorney's advice[,] requires full disclosure of all the material facts...." United States v. Martorano, 767 F.2d 63, 66 (3d Cir.) cert. denied, 474 U.S. 949, 106 S.Ct. 348, 88 L.Ed.2d 296 (1985). It must be remembered that the advice of counsel defense is meant to be available only to those who, after full and honest disclosure of the material facts surrounding a possible course of action, seek and obtain the advice of counsel on the potential legality of their actions. Id. The defense is not designed to insulate illegal conduct. Id. Rather, the basis for the defense "is that, in relying on counsel's advise, [a] defendant lacked the requisite intent to violate the law." United States v. Polytarides, 584 F.2d 1350, 1353 (4th Cir.1978). See also United States v. Conner, 752 F.2d 566, 574 (11th Cir.) (must consult attorney in good faith for the purpose of securing advice on the lawfulness of future conduct), cert. denied, 474 U.S. 821, 106 S.Ct. 72, 88 L.Ed.2d 59 (1985).
 
 
 69
 In this case, counsel's advice was sought on the legitimacy of the 100 hours program. The nature of the disclosure required to satisfy the materiality element of the advice of counsel defense requires an ex ante examination. Disclosures which are material before the potentially illegal action was taken cannot be rendered immaterial for the purposes of the advice of counsel defense based on the fortuity of a later conceived litigation strategy, i.e. by the Enmons defense. Thus, material facts, in this case, included not only the ends sought from the 100 hours program but the means to be used in the collection process. It was only through disclosure of both the means and the ends that counsel could properly evaluate the potential legality of the 100 hours program.
 
 
 70
 Accordingly, viewed in the light of the evidence, the advice of counsel defense was fairly and adequately submitted to the jury.[11]
 
 
 71
 c. Knowledge and Willfulness
 
 
 72
 The district court instructed the jury on the element of knowledge and willfulness as follows:
 
 
 73
 If you find that a defendant had a good faith belief that he was acting pursuant to a legitimate union objective, such as the resolution of a grievance or the enforcement of a contract term, then you should find that the defendant did not act wilfully. On the other hand, if a defendant believed that requiring working principals to report at least a hundred hours per month was a hustle, or if a defendant did not really believe that he was acting legitimately to resolve a bona fide grievance as contemplated by the contract, then you should find that the defendant did not have such a good faith belief.
 
 
 74
 Appellants claim that the inclusion of the word "hustle", over their objection, was unnecessary and prejudicial. Appellants note that the phrase "a hustle" was a quote from one of the taped conversations between Traitz, Jr. and Medina. Appellants contend that by using the word "hustle" in the context of the 100 hours program the district court highlighted one piece of the evidence in such a way as to demean the appellants' Enmons defense and was therefore in error.
 
 
 75
 It is settled law that "in examining an allegedly erroneous instruction to the jury, it is necessary to view the charge as a whole." Ayoub v. Spencer, 550 F.2d 164, 167 (3d Cir.) cert. denied, 432 U.S. 907, 97 S.Ct. 2952, 53 L.Ed.2d 1079 (1977). See Walters v. Mintec/International, 758 F.2d 73, 76 (3d Cir.1985). It must be recalled that a "district judge has broad discretion in framing the form and language of the charge to the jury." Board of Water Works of the City of Des Moines, Iowa v. Alvord, Burdick & Howson and Dorr-Oliver, Inc., 706 F.2d 820, 823 (8th Cir.1983). "When the instructions, taken together, properly expresses the law applicable to the case, there is no error even though an isolated clause may be inaccurate, ambiguous, incomplete or otherwise subject to criticism." Somer v. Johnson, 704 F.2d 1473, 1477-78 (11th Cir.1983). In order for this Court to be justified in reversing the district court, we "must be left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." Id. at 1478; quoting, Miller v. Universal City Studios, Inc., 650 F.2d 1365, 1372 (5th Cir.1981).
 
 
 76
 Admittedly, "hustle" was not the best word for the district court to use. As the appellants note, it would have been better for the district judge to have said that the jury must assess whether the defendants had a "genuine belief" that the 100 hours program was legitimate. This error, however, amounts to no more than a minor indiscretion and cannot form the basis for reversal of the district court. The district judge's charge on the issue of knowledge and willfulness, when viewed as a whole, clearly and accurately set forth the law. The district judge informed the jury that if the defendants had a good faith belief that they were acting in pursuit of a legitimate union objective then the jury should find that the defendants did not act willfully. We are not permitted, and it would not be desirable, to reverse the district court simply because its use of the word "hustle" may be "subject to criticism." Somer v. Johnson, 704 F.2d at 1478. Therefore, we conclude that the issue was fairly and adequately submitted to the jury.
 
 
 77
 3. Pennsylvania and New Jersey Bribery Statutes as RICO Predicate Acts
 
 
 78
 In Count two of the superseding indictment, appellants Traitz, Jr., Hurst, Mangini, Crosley, Osborn, Williams and Nuzzi were charged with violations of the Pennsylvania and New Jersey bribery statutes as predicate acts comprising a pattern of racketeering in violation of RICO.[12] 18 U.S.C. Sec. 1961(5). The indictment specifically charged the appellants with violations of the Pennsylvania Bribery statute,[13] 18 Pa.C.S. Sec. 4701, and the New Jersey Bribery statute,[14] N.J.S.A. Sec. 2C:27-2. All of the above mentioned appellants were convicted on the substantive RICO count charged in count two.[15] 18 U.S.C. Sec. 1962(c).
 
 
 79
 In addition, counts 64 and 65 of the superseding indictment charged appellants Traitz. Jr. and Nuzzi with traveling in interstate commerce to commit bribery in violation of 18 U.S.C. Sec. 1952.[16] Specifically, appellants Traitz, Jr. and Nuzzi were charged with traveling from Philadelphia, Pennsylvania to Camden, New Jersey with the intent to bribe New Jersey Sheriff William Simon and New Jersey Deputy Sheriff Norbert Zuchowski. Thus, it is New Jersey law which is to be used to furnish the definition of bribery for purposes of the Sec. 1952 counts. 18 U.S.C. Sec. 1952(b)(2). See United States v. Dansker, 537 F.2d 40, 47 (3d Cir.1976). Both Traitz, Jr and Nuzzi were convicted on both counts 64 and 65.
 
 
 80
 In charging the jury on the elements of bribery in both New Jersey and Pennsylvania, the district judge charged the jury, in relevant part,[17] as follows:To prove the acts of racketeering charging bribery under Pennsylvania and New Jersey law, the government need not show that the public official or public servant performed any act or intended to perform any act in return for the money or property given to him. Rather, the focus must be on the alleged bribers--that is, the defendants--and whether or not they intended to influence official action through the payment of money or giving of property.
 
 
 81
 Appellants contend that the district judge's charge to the jury was in error in that the judge should have informed the jury that in order to find a violation of either the Pennsylvania or New Jersey bribery statutes the jury must find a quid pro quo between the alleged briber and the alleged bribee. More specifically, appellants claim that the judge should not have charged the jury that the relevant inquiry is whether the appellants intended to influence official action. Rather, in appellants' view, the judge should have told the jury that they must find that an agreement existed between the appellants and those receiving the benefit in order for the jury to find that the appellants acted in contravention of the state bribery statutes.
 
 
 82
 We must review the jury charge to determine if, taken as a whole and in the light of the evidence, it fairly and adequately submitted the issue to the jury. Link v. Mercedes Benz of North America, 788 F.2d 918, 922 (3d Cir.1986). If the district judge communicated the substance of the law correctly to the jury such that the jury was not mislead as to the applicable law and the relevant issues, then there is no error. Dairyland Insurance Co. v. Makeover, 654 F.2d 1120, 1127-28 (5th Cir.1981).
 
 
 83
 Both Pennsylvania and New Jersey make it a crime for a party to offer, confer or agree to confer upon another any benefit in consideration for the violation of an official duty.[18] The question which must be addressed is whether the "in consideration for" language creates a requirement of mutual assent on the parts of both the briber and the bribee to form an agreement or if it instead merely requires a subjective intent on the part of the briber to confer a benefit in return for some illicit gain. We conclude that the latter position is the correct one and that the district judge's charge to the jury on the state bribery laws accurately reflected the legal elements of those offenses.
 
 
 84
 Both the Pennsylvania and New Jersey bribery statutes were adopted from Sec. 240.1 of the Model Penal Code. Under both Pennsylvania and New Jersey law it is a crime to offer, confer or to agree to confer any benefit as consideration for the violation of an official duty. The offering of a benefit as consideration does not logically imply that an agreement has been formed (much less that a quid pro quo has been delivered) but merely evidences a party's, i.e. the offeror's, subjective intent to enter into a transaction. This position is in accord with the clear intent of the authors of the Model Penal Code, to wit:
 
 
 85
 The Offense of bribery is defined in a manner that includes a completed agreement between the person who offers the bribe and the person who receives it. It also permits prosecution of inchoate conduct intended to achieve that objective. The terms "offers" and "solicits" clearly refer to such inchoate behavior and are designed to include what might be regarded as an attempt to give or receive a bribe.
 
 
 86
 * * *
 
 
 87
 * * *
 
 
 88
 In the context of bribery one who "solicits" a benefit "in consideration for" his official conduct is thus one who, with the purpose to promote or facilitate his receipt of a benefit in exchange for his official action, commands, encourages, or requests another to supply the benefit....
 
 
 89
 The solicitation aspect of the offense is thus, in effect, a crime of purpose; the actor must have as his conscious objective the receipt of a benefit as consideration for official conduct on his part. The term "offers" as it applies to the bribe giver similarly implies purposeful conduct.
 
 
 90
 Model Penal Code Sec. 240.1 Comment 4(a) (Official Draft and Revised Comments, 1980).
 
 
 91
 Similarly, the "conferring" of a benefit does not require the formation of an agreement. As the Comments to the Model Penal Code instruct:
 
 
 92
 Given the established applicability of the bribery offense to inchoate behavior, it would be possible to construe "confers" and "accepts" as signifying a completed bilateral arrangement-in effect an illegal contract to exchange a benefit as consideration for the performance of an official function. To do so, however, would impose a burden of proof on the prosecution which seems wholly unwarranted. The evils of bribery are fully manifested by the actor who believes that he is conferring a benefit in exchange for official action, no matter how the recipient views the transaction ... It is wholly appropriate, therefore, to view the action of conferring a benefit or accepting a benefit entirely from the point of view of the actor. If he meant to confer a benefit as consideration for official action or accept a benefit for that purpose, the offense of bribery is complete. (emphasis in the original)
 
 
 93
 * * *
 
 
 94
 * * *
 
 
 95
 Each defendant should be judged by what he thought he was doing and what he meant to do, not by how his actions were viewed by the other party.
 
 
 96
 Model Penal Code Sec. 240.1 comment 4(c) (Official Draft and Revised Comments, 1980), quoted in, Martinez v. State, 696 S.W.2d 930, 933 n. 2 (Tex.App.1985).[19]
 
 
 97
 The superseding indictment charged appellants with having offered or conferred benefits in violation of both the Pennsylvania and New Jersey bribery laws. Thus, against the backdrop of the superseding indictment in this case, the Pennsylvania and New Jersey bribery statutes do not require for their satisfaction, that an agreement be reached between the briber and the bribee but only require that the briber offer money or property to another with the subjective intent that s/he will induce some prohibited act in return. Therefore, the relevant inquiry, as the district court charged, was whether the appellants intended to influence official action through the payment of money or giving of property.
 
 
 98
 This view is in accord with previous decisions of this Court, the Eastern District of Pennsylvania as well as decisions of the Superior Court of Pennsylvania.[20] This Court previously noted that "the gravamen of the offense defined in Sec. 4701 [of the Pennsylvania Crimes Code] is the solicitation or acceptance of a bribe not the delivery of its quid pro quo." United States v. Davis, 576 F.2d 1065, 1067 (3d Cir.1976), cert. denied, 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978). See also United States v. Mazzio, 501 F.Supp. 340, 343 (E.D.Pa.1980) (mere offering of a bribe to a public servant completes the offense of bribery under Pennsylvania law), aff'd, 681 F.2d 810 (3d Cir.1982), cert. denied, 457 U.S. 1134, 102 S.Ct. 2961, 73 L.Ed.2d 1351 (1982). As the Superior Court of Pennsylvania stated: "Under the section of the Crimes Code prohibiting bribery in official and political matter, once the offer to confer the proscribed benefit ... is made, the crime is complete." Commonwealth v. Clarke, 311 Pa.Super. 446, 457 A.2d 970, 972 (1983), quoting, Commonwealth v. Ohle, 291 Pa.Super. 110, 435 A.2d 592, 596 (1981).
 
 
 99
 For all the foregoing reasons, we conclude that the district judge's bribery charge fairly and accurately submitted the law to the jury and that, accordingly, the charge was not in error.[21]
 
 
 100
 4. Extension of Credit by Extortionate Means
 
 
 101
 Counts 42-61 of the superseding indictment charged appellants Traitz, Jr., Medina, Crosley, Shoenberger, Williams, Osborn, Traitz, Traitz, III, Mangini and Cannon with the collections of extensions of credit by extortionate means in violation of 18 U.S.C. Sec. 894. In addition, counts 42-44, charging Traitz, Jr. with violating 18 U.S.C. Sec. 894, was included by reference into count two as predicate acts constituting a pattern of racketeering in violation of RICO. Each of the appellants charged with violating Sec. 894, with the exception of Mangini, were found guilty of at least one count.
 
 Section 894 provides:
 
 102
 (a) Whoever knowingly participates in any way, or conspires to do so, in the use of any extortionate means
 
 
 103
 (1) to collect or attempt to collect any extension of credit, or
 
 
 104
 (2) to punish any person for nonpayment thereof.
 
 
 105
 shall be fined not more than $10,000 or imprisoned not more than 20 years or both.
 
 
 106
 Section 891(1) states that "[t]o extend credit means to make or renew any loan, or enter into any agreement, tacit or express, whereby the repayment or satisfaction of any debt or claim, whether acknowledged or disputed, valid or invalid, and however arising, may or will be deferred."
 
 
 107
 Appellants claim that there was insufficient evidence to convict them on the Sec. 894 charges. The appellants also contend that the jury instructions on these charges were improper. We will deal with each of appellants' objections in turn.
 
 
 108
 a. Sufficiency of Evidence
 
 
 109
 The appellants claim that their convictions on counts 45, 48-50, 52-54 and 56-61, stemming from the appellants activities in the 100 hour program, were in error as there was insufficient evidence upon which to rest a guilty verdict. In order to find a violation of 18 U.S.C. Sec. 894 there must be both "an 'extension of credit' and the use of 'extortionate means.' " United States v. Giampa, 758 F.2d 928, 933 (3d Cir.1985). Appellants argue that the union pronouncement that working principals must make a minimum monthly payment to the union of $60 was not an "extension of credit" as that term is used in Sec. 894.[22] The jury verdict must be upheld if there is "substantial evidence, taking the view most favorable to the government, to support it." United States v. Anderson, 859 F.2d 1171, 1175 (3d Cir.1988).
 
 
 110
 Appellants' argument does not withstand analysis. In United States v. DiPasquale, 740 F.2d 1282 (3d Cir.1984), cert. denied, 469 U.S. 1228, 105 S.Ct. 1226, 84 L.Ed.2d 364 (1985), this Court noted that "Congress explicitly intended that chapter 42 [of which Sec. 894 is a part] be wielded with 'vigor and imagination.' " Id. at 1288, citing, Cong.Rep. No. 1397, 90th Cong.2d. Sess. 31, reprinted in, 1968 U.S.Code Cong.Ad.News 1962, 2029. This Court also noted that the "definition of extension of credit in Sec. 891(1) was generously drafted ... [and] has been even more generously construed." United States v. DiPasquale, 740 F.2d at 1288.
 
 
 111
 Thus, to find an "extension of credit" we need only find an agreement whereby the repayment or satisfaction of any debt--even a wholly fictitious debt--may or will be deferred. Id. at 1287. The agreement to defer repayment may be a tacit one which is implied from the circumstances surrounding the creation of the debt. Id. In DiPasquale, the appellants engaged in several instances of violent conduct whereby the appellants would, after claiming the right to a fictitious debt, torture their "debtor" and collect the claimed debt. On these facts, this Court concluded that under "section 891(1) an agreement to defer the repayment of a debt may be implied from the debt, even if the debt is wholly fictitious." Id.
 
 
 112
 In this case, there was both a debt and a tacit agreement that the debt's repayment would be deferred. The appellants, through their involvement in the union's 100 hour program, adopted a policy that working principals had to make a minimum monthly union payment of $60. Thus, on the first day of each month union contractors subject to the 100 hours program owed the Roofers Union a debt of at least $60 in fees for that month. This debt was not, however, expected to be paid until sometime after the end of each month when the union-contractor would submit a statement indicating the number of hours worked for the preceding month. On these facts, we can find both a debt and a tacit agreement to defer repayment of the debt. The requirement of "an extension of credit" under Sec. 891(1) is satisfied.
 
 
 113
 Appellants' arguments to the contrary are entirely unavailing. First, appellants place great weight on United States v. Boulahanis, 677 F.2d 586 (7th Cir.), cert. denied, 459 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982), in claiming that Sec. 894 must be interpreted narrowly. This Court, however, explicitly rejected Boulahanis concluding that it was inconsistent with both the language and the purpose of chapter 42. United States v. DiPasquale, 740 F.2d at 1288.
 
 
 114
 Second, appellants claim that this Court's decision in United States v. Giampa, 758 F.2d 928, cannot be reconciled with DiPasquale and thereby limits DiPasquale. In Giampa, the alleged extortionist and several of his friends gave a man named Ciambrone funds in excess of $70,000 in the course of several separate transactions on the promise by Ciambrone that business ventures would be undertaken with the investors as partners in the enterprises. Id. at 930. The businesses were never opened and Giampa was eventually indicted based on threats he made to Ciambrone. Id. at 930-31. The district court in Giampa entered a judgment of acquittal on the ground of insufficient evidence. The issue on appeal was whether the district court's judgment of acquittal barred this Court from reviewing the merits of the case on appeal because of principles of double jeopardy. Id. at 933. This Court concluded that the district court's entry of judgment of acquittal barred review of the case on the merits. Id. at 934. In passing, this Court noted that based on the evidence at trial the district judge could reasonably find that there was no "extension of credit" within the terms of Sec. 891(1) because the funds were given by the alleged extortionist as an investment rather than as a loan.
 
 
 115
 Even if we were inclined to look beyond the clearly distinguishable factual setting of Giampa, we could not find that Giampa restricts our analysis. This is the case because the holding in Giampa was that the appeal was barred by the double jeopardy clause and, accordingly, any comments regarding the merits of the Sec. 894 charge are mere dicta. Thus, viewing the evidence, as we must, in the light most favorable to the government, we conclude that there was sufficient evidence to support the convictions under Sec. 894.b. Jury Instructions
 
 
 116
 Appellants contend that the district judge erred in refusing to permit the jury to consider Enmons as a defense to the Sec. 894 (extension of credit by extortionate means) charges.[23] Appellants' contention is without merit. Appellants do not cite any case in which Enmons has been applied as a defense to a prosecution under any statute other than the Hobbs Act. Moreover, the Supreme Court's "holding in Enmons turned on its reading of the specific language of Sec. 1951--in particular the term 'wrongful' in the definition of extortion--and its reading of the Hobbs Act's singular legislative history." United States v. Thordarson, 646 F.2d 1323, 1327 (9th Cir.), cert. denied, 454 U.S. 1055, 102 S.Ct. 601, 70 L.Ed.2d 591 (1981). We believe it wholly inappropriate to find that Enmons was meant to create a defense to a violation of Sec. 894 where no legislative history can be found indicating a congressional intent to create such a defense. Cf. United States v. Thordarson, 646 F.2d at 1330 (court refused to find Enmons defense applicable to the Travel Act, 18 U.S.C. Sec. 1952, RICO, 18 U.S.C. Sec. 1962(d) or to use of explosives charges under 18 U.S.C. Sec. 844(i)). Accordingly, we find that the charge given to the jury was not erroneous.
 
 
 117
 5. Admission of Evidence Concerning Uncharged Acts of Violence
 
 
 118
 The district court, over the objection of the appellants, admitted 24 tape recordings involving uncharged acts of violence pursuant to Rule 404(b) of the Federal Rules of Evidence. Appellants contend that the tapes should not have been admitted because they do not bear on the appellants' intent. "The standard by which we review a trial judge's decision to admit evidence of uncharged offenses is abuse of discretion." United States v. O'Leary, 739 F.2d 135, 136 (3d Cir.1984), cert. denied, 469 U.S. 1107, 105 S.Ct. 782, 83 L.Ed.2d 776 (1985).
 
 
 119
 Recently, this Court has had the opportunity to address the scope of Rule 404(b). United States v. Scarfo, 850 F.2d 1015 (3d Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 263, 102 L.Ed.2d 251 (1988). In Scarfo this Court stated that "[t]he drafters contemplated that Rule 404(b) would be construed as a rule of 'inclusion' rather than 'exclusion.' " Id. at 1019. We also noted that "[t]he possible uses of other crimes evidence listed in the Rule--motive, opportunity, intent, preparation, plan, knowledge, identity and absence of mistake--are not the only proper ones." Id. at 1019.
 
 
 120
 The relevant inquiry is not simply whether the tapes were probative of intent but "whether that evidence is probative of a material issue other than character." Huddleston v. United States, 485 U.S. 681, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988). In ruling on a suppression motion, the district court found, and the appellants do not contest, that the evidence of other violence goes to a "shared tradition" of violence and toward showing a "symbiotic relationship." Therefore, the evidence shows "the background of the charges, the parties' familiarity with one another and their concert of action." United States v. O'Leary, 739 F.2d at 136. Thus, in a conspiracy context these matters constituted permissible grounds for admission of evidence of other violence under Rule 404(b). Id. at 136-137.
 
 
 121
 Given that the evidence was admissible under Rule 404(b) and the enlarged mount of deference to be given a district judge under Rule 403 in balancing its probative value and the prejudice to appellants, we conclude that the district judge did not abuse his discretion in admitting the tapes pursuant to Rule 404(b). See United States v. Scarfo, 850 F.2d at 1019 ("[i]f judicial self restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal."), citing, United States v. Long, 574 F.2d 761, 767 (3d Cir.), cert. denied, 439 U.S. 985, 99 S.Ct. 577, 58 L.Ed.2d 657 (1978).
 
 
 122
 Appellants contend that notwithstanding the merits of the district court's analysis concerning the admissibility of the tapes under Rules 403 and 404(b), the district court erred in admitting the evidence without requiring the government to prove that the tapes were admissible pursuant to 18 U.S.C. Sec. 894(b) and (c). Appellants' argument is fatally flawed. 18 U.S.C. Sec. 894(b) and (c) do not provide independent limitations on the admissibility of evidence otherwise admissible under Rules 403 and 404(b) of the Federal Rules of Evidence. As the legislative history of these subsections indicate, Sec. 894(b) was meant merely to "codify a principle of evidence which already appears in the case law ... [t]o allow evidence as to other criminal acts by the defendant to be introduced for the purpose of showing the victim's state of mind." Conf.Rep. No. 1397, 90th Cong., 2d Sess., cited in, 1968 U.S.Code Cong. & Ad.News 2028. Similarly, Sec. 894(c) was enacted to permit the introduction of reputation evidence where such introduction was not uniformly permitted. See Id. at 2026. Thus, the district court did not err in failing to analyze the admissibility of the tapes under Sec. 894(b) and (c) after finding that they were admissible pursuant to Rules 403 and 404(b) of the Federal Rules of Evidence.
 
 B. OSBORN
 
 123
 Appellant Osborn was convicted, inter alia, of four counts of Hobbs Act extortion. 18 U.S.C. Sec. 1951. Osborn contends that there was insufficient evidence upon which to convict him of any of these charges. We must examine the evidence in the light most favorable to the government to determine if it was sufficient.
 
 
 124
 To support a conviction under the Hobbs Act the government was required to prove (1) that the defendant induced his victim to part with property; (2) that the defendant did so by extortionate means; and (3) that interstate commerce was affected. United States v. Rabbit, 583 F.2d 1014, 1023 (8th Cir.1978), cert. denied, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979); United States v. Addronizio, 451 F.2d 49, 59 (3d Cir.), cert. denied, 405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972). Extortion is in turn defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence or fear." 18 U.S.C. Sec. 1951(b)(2).
 
 
 125
 Before moving to the appellant's specific arguments, we must address appellant's contention that in three of the four counts upon which he was convicted the government failed to show that there was an effect on interstate commerce. This assertion merits priority consideration because it raises a challenge to this Court's jurisdiction. See e.g. United States v. Staszuk, 517 F.2d 53, 59 (7th Cir.1975) (en banc). The basis for this contention is that in three of the four counts the government failed to elicit specific testimony as to how the businesses of the individual contractors who were the object of the extortion effected or were effected by interstate commerce.
 
 
 126
 This Court has recognized that "Congress intended, by enacting the Hobbs Act, to punish interference with interstate commerce to the fullest extent possible under its constitutional power." United States v. Mazzei, 521 F.2d 639, 642 (3d Cir.1975) (en banc), cert. denied, 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975). Consistent with this view, other courts of appeal have recognized that the impact on interstate commerce necessary to satisfy the Hobbs Act required is de minimis. United States v. Hedman, 630 F.2d 1184, 1195 (7th Cir.1980) (en banc), cert. denied, 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981); United States v. Sander, 615 F.2d 215, 218 (5th Cir.) ("minimal effect" on interstate commerce is necessary.), cert. denied, 449 U.S. 835, 101 S.Ct. 108, 66 L.Ed.2d 41 (1980); United States v. Rabbit, 583 F.2d 1014, 1023 (8th Cir.1978). Moreover, the impact on interstate commerce may actually be positive or beneficial to interstate commerce. United States v. Hedman, 630 F.2d at 1195. See also United States v. Mazzei, 521 F.2d at 642 n. 1 ("We do not consider the absence of affect on interstate commerce is shown by the fact that BMI [the object of the extortion] had a net cash inflow by reason of entering into the leases.").
 
 
 127
 In each of the cases cited above, the effect on interstate commerce was found to have existed by virtue of a depletion of the assets of the object of the extortion thereby diminishing that party's ability to purchase goods in interstate commerce. In this case, however, the government failed to introduce evidence that three of the four contractors either bought or sold any goods in interstate commerce. While the government contends that the jury was entitled to infer such facts based on evidence that roofing contractors in general purchased supplies in interstate commerce, we need not rely on this justification.
 
 
 128
 Instead, we find that the interstate commerce element is satisfied by the fact that the Roofers Union and its affiliated benefit plans were interstate entities. To the extent that the Roofers Union would increase its revenues, or attempt to do so, by extorting or attempting to extort payments from contractors, the Roofers Union would have, or would attempt to have, more funds available to provide benefits to union members in several states. This is sufficient to supply the requisite nexus to interstate commerce. We believe that this conclusion is consistent with the congressionally intended breadth of the Hobbs Act as well as the Act's language prohibiting a party from affecting commerce in "any way."
 
 
 129
 Having determined that there was the requisite affect on interstate commerce, we next discuss the sufficiency of evidence as to each of the four counts upon which Osborn was convicted.
 
 1. Valentino Foti--Count 26
 
 130
 Osborn contends that the evidence was insufficient to establish that he extorted money from Valentino Foti in that the government failed to provide evidence that the second prong of the Hobbs Act test was met. Specifically, Osborn claims that the government failed to prove that Foti was put in fear and, even if the government proved otherwise, that it failed to prove there was a nexus between the fear and Foti's payments to the Roofers.
 
 
 131
 "It is well settled that the element of 'fear' required for the Hobbs Act can be satisfied by placing a person in apprehension of economic loss." United States v. Agnes, 753 F.2d 293, 302 n. 15 (3d Cir.1985). See United States v. Capo, 817 F.2d 947, 951 (2d Cir.1987) (en banc). A two-part test is to be employed to determine if a purported victim of an extortion was put in fear of economic loss. Examining the situation from the perspective of the victim "the proof need establish that the victim reasonably believed first, that the defendant had the power to harm the victim, and second, that the defendant would exploit that power to the victim's detriment." Id. at 951 (emphasis in the original).
 
 
 132
 Viewed in the light most favorable to the government, the evidence of fear of economic loss was sufficient to support the jury's guilty verdict. In this case, Foti was called in to the union offices to be informed that his participation in the 100 hours program was required. During the course of the meeting, Foti was told: "[Y]ou won't care if we put you out of the union then? 'Cause you're not making any money anyway." To which Foti responded: "Sure I would." Given the power which the Roofer's Union was shown to have over contractor selection and manpower decisions, the loss to Foti which would flow from being displaced from the union is obvious. We conclude that it was reasonable for Foti to believe that Osborn both had the power to remove him from the union and would exercise such power.
 
 
 133
 Osborn's nexus argument is also flawed. At trial, Foti testified that he had never reported 100 hours in a month to the union prior to his meeting. Foti also testified that for the months which followed the meeting, he never failed to report 100 hours. Osborn contends that Foti "liked" the 100 hours program and thus paid the $60 a month by choice rather than out of fear. It is an understatement to say that Osborn's argument strains credulity. It is highly unlikely that someone would pay more in fees than that which he legitimately owed unless that person is driven by some form of coercion. Thus, the jury was justified in finding a nexus between the payments to the union and the meeting which Foti had at the union offices.
 
 
 134
 Accordingly, the jury's guilty verdict on Count 26 was supported by sufficient evidence.
 
 2. Robert Dennis--Count 38
 
 135
 Osborn claims that the evidence was insufficient to establish that Robert Dennis was extorted by Osborn in that the government failed to prove any nexus between Dennis's fear and the payment of funds to the Roofers Union.
 
 
 136
 Dennis, like Foti, was summoned to the meeting hall of the Roofers Union to enforce his compliance with the 100 hours program. While in the meeting room, Dennis was confronted by five or six business agents of the Roofer's Union. He was hit twice by Osborn. During the encounter, Osborn was cheered on by appellant Medina who said: "Smack him in the mouth Buddy [Osborn]. Smack him again ... smack him again." In addition to physical abuse, Dennis was threatened with being thrown out of the Roofer's Union. Although prior to his encounter with the Roofer's Union, Dennis reported significantly under 100 hours, after his meeting he always reported 100 hours or more. At trial, Dennis was asked "Why did you begin paying $60 a month when you worked only 11 hours a month." Dennis responded: "That's what I was told to do."
 
 
 137
 Osborn argues that while Dennis was at the offices of the Roofers Union he was only questioned regarding the adequacy of his remittance records and that any fear he felt was not the inducement for his payments of $60 per month. We believe that the jury, after hearing about the physical and economic coercion to which Dennis was subject, could have concluded that it was the meeting which induced Dennis to pay the $60 per month to the union. This being so, we find that there was sufficient evidence upon which the jury could find Osborn guilty of Count 38.
 
 3. Allen Huntbach--Count 41
 
 138
 Osborn was charged with and convicted of the attempted extortion of Allen Huntbach. Osborn claims that the evidence was insufficient to sustain his conviction in that Osborn did not induce Huntbach to part with any property. Osborn also argues that to the extent that Huntbach did part with any property, Osborn is protected from criminal liability by virtue of the Enmons defense.
 
 
 139
 Huntbach was, and at the time of this trial remained, a member of the Roofers Union. His union membership entitled Huntbach to work for other union contractors, but Huntbach himself was not a union contractor. Huntbach, in an effort to earn extra money, engaged in working as an independent roofing contractor on weekends for friends and neighbors.
 
 
 140
 On November 26, 1985, Huntbach was summoned to the offices of the Roofer's Union. Upon entering, the meeting room, Huntbach was floored by a blow to the head. He was subsequently hit at least one more time during his encounter with several business agents including Osborn. The thrust of the business agents' discourse with Huntbach was that he could either join the union as a contractor or cease doing independent contracting work. The following excerpt suffices to show the tone and substance of the meeting.
 
 
 141
 MB: [Osborn] First of all, if you want to get into business, we'll talk. If not I want you to get rid of the kettle [an instrument used to heat tar].
 
 
 142
 * * *
 
 
 143
 * * *
 
 
 144
 I want you to stop roofing. If you're caught roofing again, you're not ever going to work around here no more. You can roof all you want if you, if you want to roof for a contractor. If you want to be a contractor, I'm gonna give you an opportunity. But you can't be working on the side, that's as simple as that. You got a ... you got a choice. You got a choice ... now what are you gonna do? You gonna work again on the weekend? You want to work again on the weekend?
 
 
 145
 * * *
 
 
 146
 * * *
 
 
 147
 AH: [Huntbach] I don't think that was right that you hit me like that. To be honest with you ...
 
 
 148
 MO: Well, how about if I, how about if I * * * hit ...
 
 
 149
 AH: (UI) [inaudible]
 
 
 150
 MO: You in the other side.
 
 
 151
 AH: Buddy, don't. Come on. What the hell man.
 
 
 152
 MO: Hey, listen, I'm telling you, you're not supposed to be * * * workin on the side. You understand that?
 
 
 153
 AH: I understand that.
 
 
 154
 It is well settled that the Hobbs Act prohibits attempted extortion. See e.g. United States v. Rosa, 560 F.2d 149, 153 (3d Cir.1977) (en banc). To prove attempted extortion the "inducement to part with property" element of the Hobbs Act is satisfied when the alleged extortionist "has attempted to induce his victim to part with property." United States v. Frazier, 560 F.2d 884, 887 (8th Cir.1977), cert. denied, 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978). In this case, looking at the evidence in the light most favorable to the government, abundant proof was introduced that Osborn attempted to induce Huntbach to join the union as a contractor. The purpose for this was to force Huntbach to pay union dues. Thus, the government introduced sufficient proof to allow a reasonable jury to conclude that Osborn attempted to induce Huntbach to part with property.
 
 
 155
 Osborn contends that he did not seek to compel Huntbach to join the union but merely to give him a choice between ceasing his contracting work and joining the union as a contractor. We are not persuaded by this argument. From his discussion with Huntbach, Osborn knew that Huntbach owned his own kettle and was not prepared to sell it or to cease engaging in work as a roofing contractor. We believe that this so-called choice offered by Osborn was not, in practical terms, a real choice but amounted only to a veiled threat. As such, it cannot shield Osborn from criminal liability.
 
 
 156
 Osborn next contends that his actions are protected under the doctrine announced in United States v. Enmons, 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973). As discussed previously, to the extent that Enmons was properly found to apply to the facts of this case at all, it can only be used to protect a defendant from liability where his conduct was permitted under the terms of the collective bargaining agreement. The collective bargaining agreement, however, prohibits the imposition of pressure against principals to induce them to join the union. Thus, viewing Osborn's actions as an attempt to induce Huntbach to join the union as a principal, these action were prohibited by the collective bargaining agreement and were not protected by Enmons.
 
 
 157
 Accordingly, the evidence was sufficient to sustain the jury's finding of guilt on Count 41.
 
 4. David Maisey--Count 36
 
 158
 Osborn was charged with and convicted of the attempted extortion of David Maisey. Osborn claims that the evidence was insufficient for the jury to have found that Osborn induced Maisey to part with property.
 
 
 159
 Osborn's confrontation with Maisey is reminiscent of his encounter with Huntbach. While at the Roofer's offices, Maisey was hit and was told that he could not continue to operate as a non-union contractor. At one point during the meeting, appellant Crosley said to Maisey: "Don't get scared now, you should have been scared ... when you started this, when he [Osborn] told you weeks ago to get the * * * out of the roofin' business." In the end, Maisey could either join the union as a contractor or stop working as a roofing contractor.
 
 
 160
 Preliminarily, Osborn contends that his conviction cannot be upheld because Maisey's statements in the tape recorded conversation were not admitted for their truth but rather to show Maisey's state of mind. We reject this argument because we do not rely on Maisey's statements at all in deciding the merits of Osborn's claim.
 
 
 161
 We believe that, taking the evidence in the light most favorable to the government, the jury could reasonably conclude that Osborn attempted by threats to induce Maisey to join the union and to in turn pay union dues. Moreover, for the reasons stated above, Osborn's Enmons defense similarly fails. Accordingly, Osborn's conviction on Count 36 will be affirmed.
 
 C. CANNON
 
 162
 Appellant Cannon was indicted and convicted of one count of Hobbs Act extortion, one count of collection of credit by extortionate means and one count of RICO conspiracy. Cannon contends that the evidence was insufficient to warrant his conviction on any of these charges. We will examine the evidence in the light most favorable to the government to determine if the convictions can be upheld. United States v. Anderson, 859 F.2d 1171, 1175 (3d Cir.1988).
 
 
 163
 Because Cannon's encounter with a contractor named Franco Procaccino was crucial to his eventual convictions, this incident will be outlined before the merits of Cannon's claims are discussed. Procaccino was summoned to the offices of the Roofers Union. Once there, Procaccino was questioned by at least three officers of the Roofers Union regarding the accuracy of his records. At one point, Procaccino was asked to leave the meeting room in which he was being questioned and in his absence appellant Medina stated: "he's scared to death." To which Joseph Traitz responded, inter alia, "How about getting the 100 hours." Later in the conversation Medina stated: "let me get Ernie Williams and tell 'em to hit 'em in the head." Several minutes into the encounter, Cannon entered the room. Cannon, in the course of a heated discourse with Procaccino, pulled Procaccino's ear and asked Procaccino if he was listening. After Cannon left the meeting room, Procaccino was informed that he would be required to report 100 hours per month to the Roofers Union and pay the concomitant $60 monthly fee in order to remain a member of the Roofers Union. At trial, Procaccino testified that he was frightened during his encounter at the offices of the Roofers Union.
 
 
 164
 1. Sufficiency of Evidence on the Extortion Counts
 
 
 165
 Cannon claims that the evidence against him on both the Hobbs Act and the collection of credit by extortionate means charges was deficient in four ways, to wit: (1) the government did not prove that Cannon knowingly participated in the extortion; (2) the government did not establish that Cannon personally demanded Procaccino to pay money; (3) the government failed to prove that Procaccino was induced to pay money to the union out of fear; and (4) no evidence was introduced that Procaccino was forced to pay money which he did not actually owe to the union. We will deal with each of these contentions seriatim.
 
 
 166
 a. Knowing Participation
 
 
 167
 Cannon claims that the government failed to prove that he knowingly participated in the crimes of extortion charged. Cannon bases this assertion on the fact that during the time when Cannon was in the meeting room with Procaccino the only topic discussed was the accuracy of Procaccino's remittance reports. Cannon argues that it was not possible to conclude that he knew that Procaccino was called to the meeting room to be extorted.
 
 
 168
 Cannon's contention is meritless. In this case there was ample evidence that the confrontations between Roofers Union officials and roofing contractors followed a set script. Moreover, one of the taped conversations introduced into evidence exposed Cannon's awareness of the pattern. Therefore, under these circumstances, Cannon's knowledge of and participation in the overall scheme, the jury could reasonably find that Cannon knew that Procaccino was summoned to the Roofers offices in order to be informed that his compliance with the 100 hours program would be required. See United States v. Briola, 465 F.2d 1018, 1022 (10th Cir.1972), cert. denied, 409 U.S. 1108, 93 S.Ct. 908, 34 L.Ed.2d 688 (1973); United States v. Quintana, 457 F.2d 874 (10th Cir.1972), cert. denied, 409 U.S. 877, 93 S.Ct. 128, 34 L.Ed.2d 130 (1972).
 
 
 169
 b. Personal Demand To Pay Money
 
 
 170
 In a similar vein, Cannon argues that his extortion convictions cannot be upheld because there was no proof that Cannon either personally demanded the money or that any money was demanded in his presence. We reject this argument. In a case such as this, where the crimes of extortion follow a similar pattern and the alleged extortionist has knowledge of this pattern, it is unimportant that Cannot did not personally demand money or actually hear the demand. See United States v. Rosa, 560 F.2d 149, 154 (3d Cir.1977). See also United States v. Bell, 812 F.2d 188, 194 (5th Cir.1987) (Defendant may be "punished as one of several principals, each of whom performs only one role in a multi-part scheme to extort money and none of whom executes every step of that scheme."). On these facts, it was enough for the government to introduce evidence that Cannon was a participant in a common scheme. See United States v. Briola, 465 F.2d at 1022.
 
 
 171
 c. Fear
 
 
 172
 Cannon claims that there was insufficient evidence to show either that Procaccino was put in fear or, even assuming that he was put in fear, that his payments to the union were linked to his being afraid. In this case, Procaccino was shouted at by several men and Cannon, at one point, pulled Procaccino's ear. Moreover, the conversation intercepted between Medina and Joseph Traitz indicated that they believed Procaccino was afraid and that they were planning to continue intimidating Procaccino by calling in another man to hit him on the head. Furthermore, Procaccino testified at trial that he was afraid. Based on this evidence the jury could reasonably find that Procaccino was put in fear.
 
 
 173
 In addition, Procaccino testified at trial that, although, he had never previously reported 100 hours in a month, after his meeting he never failed to report 100 hours in a month. We conclude that based on this fact the jury could reasonably have found the required nexus between Procaccino's fear and his reporting of 100 hours to satisfy the requirements of both extortion statutes.
 
 
 174
 d. Enmons Defense
 
 
 175
 Finally, Cannon claims that his extortion convictions must fall because extortion cannot lie where the union was collecting money to which it was lawfully entitled. First, we must reiterate what was said earlier, there is no Enmons defense to an action pursuant to 18 U.S.C. Sec. 894 (extension of credit by extortionate means).
 
 
 176
 Second, to the extent that the Enmons defense was properly considered by the jury at all in this case, the jury could have rejected this defense based on the relevant facts. Procaccino testified that he might not have worked 100 hours in February, 1986, although he did report 100 hours worked to the union. In addition, on cross-examination Procaccino was asked: "in many of the months after the meeting in October, you actually worked 100 months [sic] and sometimes more; is that correct?" To which Procaccino responded: "some more and some less." Thus, the jury could have found from this evidence that during some months Procaccino worked less than 100 hours and yet paid union fees equivalent to 100 hours worked. As such payments were not provided for by the terms of the collective bargaining agreement, the union cannot in any sense be said to have had a lawful claim to the money and thus, Cannon's argument fails.
 
 2. RICO Conspiracy
 
 177
 Section 1962(d) of 18 U.S.C. provides that "It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b) or (c) of this section". In this case, Cannon was charged with and convicted of having conspired to violate 18 U.S.C. Sec. 1962(c). Cannon, along with appellant Daly, argues that his RICO conspiracy conviction cannot be sustained because the government failed to prove that he personally committed two RICO predicate acts.
 
 
 178
 This argument is without merit. As appellants note, this Court in United States v. Adams, 759 F.2d 1099, 1116, cert. denied, 474 U.S. 971, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985), held that "to be convicted of a RICO conspiracy, a defendant must agree only to the commission of the predicate acts, and need not agree to commit personally these acts." While we recognize that other circuits have taken a different view, See United States v. Ruggiero, 726 F.2d 913, 921 (2d Cir.), cert. denied sub nom. Rabito v. United States, 469 U.S. 831, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984); United States v. Winter, 663 F.2d 1120, 1136 (1st Cir.1981), cert. denied, 460 U.S. 1011, 103 S.Ct. 1249, 1250, 75 L.Ed.2d 479 (1983), appellants have not proffered any justification for this Court to change its current position. Accordingly, being bound by controlling precedent, we find that appellants' argument must fail.
 
 D. DALY
 
 179
 Daly was charged and convicted of bribery of a public official in violation of 18 U.S.C. Sec. 201(b). Specifically, Daly was convicted for having given $100 to Bernard Dillon, an official of the Occupational Health and Safety Administration (OSHA), to cause Dillon to use his authority as an area OSHA Director to order OSHA inspections to harass non-union roofing contractors. Daly contends that there was insufficient evidence to warrant his conviction in that the government did not adequately prove that Daly acted with the requisite corrupt intent. We will review the evidence in the light most favorable to the government to determine if the conviction was proper. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), United States v. Anderson, 859 F.2d 1171, 1175 (3d Cir.1988).
 
 
 180
 In relevant part, 18 U.S.C. Sec. 201(b) provides: "Whoever--(1) directly or indirectly, corruptly gives, offers, or promises anything of value to any public official ... with intent--(A) to influence any official act ... shall be ... imprisoned for not more than fifteen years.
 
 
 181
 This statute has been said to require that the alleged briber offer the bribe with a "corrupt intent" to influence official conduct. United States v. Hsieh Hui Mei Chen, 754 F.2d 817, 822 (9th Cir.), cert. denied, 471 U.S. 1139, 105 S.Ct. 2684, 86 L.Ed.2d 701 (1985). This requires the government to show that the "money was knowingly offered to an official with the intent and expectation that, in exchange for the money, some act of a public official would be influenced." United States v. Johnson, 621 F.2d 1073, 1076 (10th Cir.1980). Provided that the money is offered with corrupt intent, "the official does not necessarily even need to be aware of the bribe ... so long as a bribe is offered or promised with the required intent to influence any official act the crime is committed." Id. (citation and internal quotations omitted.)
 
 
 182
 We find that there was sufficient evidence from which the jury could find the required corrupt intent on the part of Daly. A conversation intercepted on October 23, 1985 between Daly and Traitz, Jr. revealed that Daly delivered $100 to Dillon; Daly paid this money from his personal funds and was reimbursed from the union safe. Later in the same conversation, it became clear that Daly knew that other members of the Roofers Union had met and would continue to meet with Dillon and that Dillon would continue to receive funds from the Roofers. In addition, in a conversation taped on November 11, 1985, Daly and several other Roofers Union officials stated that Dillon should be called so he can "chase" away some non-union contractors from a job site. While this conversation is not direct evidence of Daly's intent at the time he delivered the payment to Dillon, it is certainly circumstantial evidence that Daly understood Dillon was given money in order to harass non-union contractors.
 
 
 183
 Daly would have this Court conclude that he believed that he was delivering the funds simply as an expression of a "general desire to cultivate and maintain a close relationship with Dillon." This contention is not supported by the facts. We conclude that, taking the evidence in the light most favorable to the government, the jury could infer that Daly had the requisite corrupt intent. Accordingly, Daly's challenge to the sufficiency of the evidence is without merit.
 
 E. NUZZI
 
 184
 Appellant Nuzzi was charged with and convicted of two counts of having traveled in interstate commerce in aid of a racketeering enterprise in violation of 18 U.S.C. Sec. 1952. Specifically, Nuzzi was convicted of having traveled from Philadelphia, Pennsylvania to Camden, New Jersey in order to bribe New Jersey Sheriff William Simon and New Jersey Deputy Sheriff Norbert Zuchowski. Nuzzi argues that the evidence was insufficient to warrant his conviction on either of the two counts charged. We must review the evidence in the light most favorable to the government to test its sufficiency. United States v. Anderson, 859 F.2d 1171, 1175 (3d Cir.1988).
 
 
 185
 Section 1952 of Title 18 provides in pertinent part:
 
 
 186
 (a) Whoever travels in interstate or foreign commerce ... with intent to--
 
 
 187
 * * *
 
 
 188
 * * *
 
 
 189
 (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity
 
 
 190
 and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned not more than five years, or both.
 
 
 191
 (b) As used in this section 'unlawful activity' means ... (2) extortion, bribery or arson in violation of the laws of the state in which committed or of the United States.
 
 
 192
 In this case, it is New Jersey, i.e. the state in which the bribery was committed, which supplies the applicable definition of bribery.
 
 
 193
 In accordance with our earlier discussion, to be guilty of bribery under New Jersey law the government had to introduce evidence that Nuzzi knowingly offered, conferred or agreed to confer a benefit upon the New Jersey officers with the intention that the benefit influence the officers in the exercise of their discretion or induce the officers to violate a known legal duty.
 
 
 194
 The undisputed testimony of Simon and Zuchowski established that Nuzzi delivered envelopes to each of the officers in New Jersey containing $500 and $200, respectively. Furthermore, evidence was introduced that Nuzzi was aware that "holiday gifts" were being prepared for individuals including Simon and Zuchowski. In addition, in a recorded conversation between Traitz, Jr. and Nuzzi the following statements were made:
 
 
 195
 JN: [Nuzzi] I got an appointment with the sheriff. I'm gonna give him the jackets.
 
 
 196
 ST: [Traitz, Jr.] Okay.
 
 
 197
 JN: And the guy that wants the brickwork, how do you want, what do you want to do with that?
 
 
 198
 ST: Who wants it?
 
 
 199
 JN: Zuke ... his, the guy under him.
 
 
 200
 ST: Get it done.
 
 
 201
 * * *
 
 
 202
 * * *
 
 
 203
 JN: Alright, I'll tell him that too, (UI) now what should I ask Simon anything about my thing or ...
 
 
 204
 ST: Not a thing. Just say, "I feel bad."
 
 
 205
 JN: Just ...
 
 
 206
 ST: Say I was there, with two of my guys. I tried to get 'em out.
 
 
 207
 JN: Hmmm-huh.
 
 
 208
 ST: Wound up. I got * * * involved.... I had nothing to do with it. He's tonin' it down. I had nothing to do with it.
 
 
 209
 JN: The charge I got that what it looks like.
 
 
 210
 ST: Right.
 
 
 211
 JN: As long as they don't try * * * make something out of it.
 
 
 212
 ST: They won't, they won't now. They won't now because Simon's on it.
 
 
 213
 JN: Okay.
 
 
 214
 * * *
 
 
 215
 * * *JN: Long as this don't get no worse, everything will be okay. Hopefully, Simon will keep it the way it is.
 
 
 216
 ST: Ah, he's got it toned down.
 
 
 217
 JN: All right.
 
 
 218
 ST: You go ahead over and give him my best. Invite him and "Zuch," the 23rd, I got a nice luncheon for all our friends and all Labor will be there. Everybody that's anybody in Labor will be down there.
 
 
 219
 We find, based on the evidence, that the jury could reasonably have determined that Nuzzi knowingly delivered the money to the officers in the hope, inter alia, that the officers would give Nuzzi assistance with charges which were then pending against him. Thus, we conclude that the government proved all the necessary elements to establish that Nuzzi committed bribery as defined under New Jersey law and, given Nuzzi's undisputed travel from Pennsylvania to New Jersey to deliver the bribes, that Nuzzi was guilty of traveling in interstate commerce in aid of racketeering in violation of 18 U.S.C. Sec. 1952.
 
 
 220
 F. STEPHEN TRAITZ, III, JOSEPH TRAITZ AND RICHARD SHOENBERGER
 
 
 221
 During the course of the trial, approximately 500 character witnesses were called on behalf of appellant Stephen Traitz, Jr. These witnesses were typically called in groups of 10-20 persons. Defense counsel for Steven Traitz, Jr. asked one such group of witnesses: "Are you aware of any violence perpetrated by members of the union in furtherance of a union goal." On cross examination, the attorney for the government requested that one of the witnesses, William C. Kulzer, step forward from the group. The attorney for the government then asked Kulzer: "Did you employ an individual named Bob Kraisyak?" Kulzer answered: "Yes." The government attorney then asked Kulzer: "Wasn't he a victim of an assault by Stephen Traitz, III, Joseph Traitz and Richard Shoenberger." Kolzer answered: "That's what was reported."
 
 
 222
 Immediately after the question was asked and answered, counsel for Steven Traitz, Jr. objected. After a brief discussion, the district judge instructed that the statement be stricken from the record and instructed the jury to ignore the statement.
 
 
 223
 Appellants Traitz, III, Traitz and Shoenberger claim that the statement by Kulzer, even though stricken, unfairly prejudiced the appellants. The appellants ask this court to grant the three men a new trial. Under third circuit precedent where, as here, an improper statement is uttered within the jury's hearing, a new trial must be awarded unless "it is highly probable that the error did not contribute to the judgment." Government of Virgin Islands v. Toto, 529 F.2d 278, 284 (3d Cir.1976).
 
 
 224
 After reviewing the relevant evidence, we believe that it was highly probable that the single statement by Kulzer did not contribute to the eventual guilty verdicts rendered by the jury against the appellants. Each of the three appellants was found guilty of both a substantive RICO count as well as one count of RICO conspiracy. In addition, each appellant was convicted of several counts of Hobbs Act extortion and extension of credit by extortionate means, to wit: Traitz, III: four counts of Hobbs Act extortion and three counts of extension of credit by extortionate means; Traitz: six counts of Hobbs Act extortion and five counts of extension of credit by extortionate means; Shoenberger: seven counts of Hobbs Act extortion and six counts of extension of credit by extortionate means.
 
 
 225
 Appellants do not contend that Kultzer's testimony related to any of the specific counts upon which they were convicted or prejudiced them as to any of the specific counts. Rather, their complaint seems more generically to be that Kulzer's testimony put the appellants in a bad light before the jury. In this case, the jury, in a trial that lasted over two months, heard the testimony of numerous witnesses and heard tape recordings where either one, two or all of the three appellants were participating in meetings where violent acts against union contractors were taking place or were discussing past or future violent acts. On these facts and taking into account the timely curative instruction given by the district judge, we conclude that it is highly probable that the jury would have convicted the appellants without the testimony of Kulzer.
 
 G. MEDINA
 
 226
 Medina was convicted of eight counts of mail fraud, thirteen counts of Hobbs Act extortion, ten counts of collection of credit by extortionate means, one count of racketeering and one count of RICO conspiracy. Medina claims that the district court erred in (1) admitting certain statements of co-conspirators; (2) allowing the jury to hear tape recorded statements speaking to Medina'a alleged drug habit; and (3) allowing the government to use evidence of his prearrest silence against him. We will deal with each of these contentions in turn.
 
 1. Admission of Co-Conspirator's Statements
 
 227
 As an exception to the hearsay rule, Federal Rule of Evidence 801(d)(2)(E) provides in relevant part, "A statement is not hearsay if [t]he statement is offered against a party and is ... a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." To admit evidence under this exception a three-prong test must be satisfied. First, there must be evidence establishing the existence of the conspiracy and connecting the declarant and the defendant to it. Second, the statement must have been made in furtherance of the conspiracy. Third, it must have been made during the course of the conspiracy. United States v. Pecora, 798 F.2d 614, 630 (3d Cir.1986), cert. denied, 479 U.S. 1064, 107 S.Ct. 949, 93 L.Ed.2d 998 (1987).
 
 
 228
 Medina contends that two sets of statements were improperly admitted because these statements were not "in furtherance of" any conspiracy. "Because this question involves the application of legal precepts to the facts surrounding he conversations, our review is plenary." Id.
 
 
 229
 a. Statements by Appellant Traitz, Jr.
 
 
 230
 On October 31, 1985, Medina, Crosley, Schoenberger and Osborn were meeting with a contractor named Willie Brailsford in the business agents meeting room. At the same time, Traitz, Jr., Hurst and Danny McBride were meeting in Traitz, Jr.'s office which was adjacent to the meeting room. After several minutes, Medina entered Traitz, Jr.'s office and requested that an agent go with him into the meeting room. Hurst then accompanied Medina back into the meeting room.
 
 
 231
 Moments later, hearing screaming from the meeting room, Traitz., Jr. began discussing with McBride the activities which take place in the meeting room. Traitz, Jr. stated: "He [Medina] was killing a guy in there one * * * day ... Yo! I love it ... I love it."
 
 
 232
 Medina's sole contention is that this was only a casual statement made in the course of a conversation between co-conspirators about past events and as such did not satisfy the "in furtherance requirement." We do not agree. While it is true that a casual conversation between co-conspirators does not meet the "in furtherance requirement," United States v. Gibbs, 739 F.2d 838, 845 (3d Cir.1984), cert. denied, 469 U.S. 1106, 105 S.Ct. 779, 83 L.Ed.2d 774 (1985), "statements between co-conspirators which provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy further the ends of the conspiracy and are admissible so long as the other requirements of Rule 801(d)(2)(E) are met." United States v. Ammar, 714 F.2d 238, 252 (3d Cir.), cert. denied, 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983).
 
 
 233
 Properly viewed, Traitz, Jr.'s statements provided reassurance to McBride that he approved of the violent means used against contractors to attain desired union ends. Moreover, the statements served to inform McBride of the nature of the union's extortionate activities. As such these statements can be said to be "in furtherance of" the conspiracy charged; i.e. the conspiracy to violate 18 U.S.C. Sec. 1962(c).
 
 
 234
 b. Appellant Crosley's Statement
 
 
 235
 On October 18, 1985, a conversation between Crosley and Edmund Gregory was intercepted. In this conversation the two men discussed that Medina was involved in a hit-and-run accident. Crosley also stated that Medina had a gun in the car at the time of the accident and that Medina was involved in a "drug thing." Finally, Crosley stated: "But regardless of all that, we reported it [the car] stolen."
 
 
 236
 Medina claims that this was merely a narrative of past events and was not "in furtherance of" the conspiracy. Again, we disagree. Crosley's statements to Gregory provided Gregory with information as to the current status of the conspiracy. United States v. Ammar, 714 F.2d at 252. Medina's accident and the subsequent false reporting of the car's theft to the insurance company provided the basis for Medina's mail fraud convictions. That these actions were considered to be within the ambit of the Roofers Union's illicit enterprise is evidenced by Crosley's reference to the fact that "we" reported the car stolen. Moreover, there was evidence that it was part of the plan and purpose of the conspiracy to falsely report the theft of the car driven by Medina and several of the overt acts charged as part of the conspiracy involved the false reporting of the car's theft. Thus, providing information to a co-conspirator about Medina's accident and the false reporting of the car's theft is properly considered "in furtherance of" the conspiracy.
 
 2. Inadmissible Tape Recordings
 
 237
 Medina claims that his convictions should be reversed because the government was permitted to introduce and play for the jury, four tape recorded conversations in which Medina's alleged drug habit is discussed. Specifically, tapes played to the jury revealed: (1) that FBI agent Tamm told Santina Collins that Medina was a "cocaine user and a drunk driver;" (2) that Traitz, Jr. told other business agents "[d]on't put anybody that fools with drugs in the union car 'cause we got a bad problem with this car now;" (3) that Traitz, Jr. told Medina that FBI agent Tamm told Collins that Medina was a "cocaine user;"[24] and (4) that Traitz, Jr. told other business agents that Medina was suspected of using drugs.
 
 
 238
 The district court allowed each of the tapes to be played in full, denying Medina's request that the portions referring to drugs be removed. The district court did, however, caution the jury that: "This case does not concern drugs. There is nothing to do with drugs that is charged against Medina or really, it has nothing to do with the charges against Mr. Medina."
 
 
 239
 When improper statements are uttered within the jury's hearing, a new trial must be awarded unless "it is highly probable that the error did not contribute to the judgment." Government of Virgin Islands v. Toto, 529 F.2d 278, 284 (3d Cir.1976). While the several statement regarding Medina's alleged drug use may well have been improperly admitted, we nevertheless conclude that it is highly probable that their admission did not contribute to the judgment of the jury.
 
 
 240
 Medina was not charged with any drug offense. Thus, the root of appellant's objection is that the introduction of evidence of his substance abuse impugned his character and may have lead the jury to convict him because of what they perceived to be his bad nature.
 
 
 241
 This argument is belied by the facts. In the course of this lengthy trial, numerous witnesses testified about the mail fraud charges and about Medina's violent and threatening behavior concerning the extortion of contractors. Indeed, over 40 tape recorded conversation were introduced in which Medina is a speaker and either the mail fraud scheme or extortion of contractors is the subject. Given the overwhelming evidence, we conclude that it is highly probable that the evidence concerning Medina's drug abuse did not prejudice him in any way.
 
 3. Prearrest Silence
 
 242
 Michael Ebner, a Philadelphia Police Officer assigned to the accident investigation division, testified as to his investigation of the June 21, 1985 hit-and-run accident in which Medina was ultimately implicated. In the course of his testimony, Ebner stated that although he attempted to talk to Medina he was never able to meet and speak with him regarding the accident. Medina claims that Ebner's testimony is, properly viewed, a comment by Ebner as to Medina's prearrest silence in violation of Medina's fifth amendment right against self incrimination.
 
 
 243
 The threshold question which must be addressed is whether, given that Ebner never actually contacted Medina, Ebner's testimony is a comment about Medina's prearrest silence. "A comment is deemed to be a reference to a defendant's silence if either: (1) it was the prosecutor's manifest intention to refer to the defendant's silence; or (2) the remark was of such a character that the jury would 'naturally and necessarily' take it to be a comment on the defendant's silence." United States v. Rosenthal, 793 F.2d 1214, 1243 (11th Cir.1986), cert. denied, 480 U.S. 919, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987). The burden of proving that a comment was designed to speak to the defendant's prearrest silence is on the defendant. Id.
 
 
 244
 In this case, Ebner's comments were not a reference to Medina's prearrest silence. The government argues that the testimony in question was elicited merely to show the steps which Ebner took in investigating the hit-and-run accident. Medina has not offered any contrary evidence and we therefore find that the prosecutor did not manifestly intend to comment on Medina's prearrest silence. In addition, the fact that Ebner was unable to contact Medina is not of such a nature that the jury would naturally and necessarily take it to be a comment on Medina's silence. Thus, Ebner's comments did not amount to a statement concerning Medina's prearrest silence and, accordingly, we conclude that Medina's fifth amendment right against self-incrimination was not impugned.[25]
 
 IV. CONCLUSION
 
 245
 Having examined all of the arguments of the appellants and having reviewed all the relevant evidence we conclude that the judgments of conviction and sentencing in each case will be affirmed.
 
 
 
 *
 Honorable Joseph J. Farnan, Jr., United States District Judge for the District of Delaware, sitting by designation
 
 
 [1]
 18 U.S.C. Sec. 2518(10)(a) provides in pertinent part: "Any aggrieved person in any trial, hearing, or proceeding in or before any court, department officer, agency, regulatory body, or other authority of the United States, a State, or a political subdivision thereof, may move to suppress the contents of any intercepted wire or oral communication, or evidence derived therefrom, on the grounds that-- ... (ii) the order of authorization or approval under which it was intercepted is insufficient on its face ..."
 
 
 [2]
 Appellants contend that the requirement of Sec. 2518(5) that the judge make "findings" rather than "determinations" as required by Sec. 2518(3), imposes an additional burden on the judge to place these "findings" in writing. There is no reason to believe, absent a showing of congressional intent to the contrary, that Congress, by using the word "findings" rather than "determinations" meant that extension orders must contain written findings by the judge where such written determinations are not required for the initial order. Whatever distinction Congress may have intended in using these two different words, we can find no justification to presume that Congress intended to require a judge to issue written findings but not written determinations. Had Congress desired to require extension orders to be based on written conclusions by the judge it would have been a simple matter to state that "written findings" are required
 
 
 [3]
 Appellants citations to United States v. Giordano, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974), United States v. Chavez, 416 U.S. 562, 94 S.Ct. 1849, 40 L.Ed.2d 380 (1974) and United States v. Lambert, 771 F.2d 83 (6th Cir.1985), cert. denied, 474 U.S. 1034, 106 S.Ct. 598, 88 L.Ed.2d 577 (1985) are unhelpful. Each of the Supreme Court cases indicates that the judge must make findings but does not discuss whether or not these findings must be made in writing. United States v. Giordano, 416 U.S. at 514, 94 S.Ct. at 1826; United States v. Chavez, 416 U.S. at 564, 94 S.Ct. at 1851. In Lambert the Sixth Circuit determined that the findings made by the judge in that case were sufficient to satisfy 2518(3)(c). That Court, however, made no determination as to whether written findings were required. United States v. Lambert, 771 F.2d at 91
 
 
 [4]
 Appellants contend that because the judge issuing the order made written findings as to two of the required factual findings it is impermissible to find that the judge intended by his signature to make the statutory findings. Appellants argument misses the point. This Court is required to determine if written findings are required in order to satisfy the requirements of 2518(3). Once we determine that the findings need not be made in writing it is irrelevant whether the district court judge made some or none of the findings expressly cannot alter this Court's determination of whether or not the statute, 2518(3), compels the findings to be so made
 
 
 [5]
 Apparently, the rationale for requiring that the United States Attorney set forth the statutory criteria explicitly is to insure compliance with the statutory requirements. United States v. Herman, 589 F.2d 1191, 1201 (3d Cir.1978), quoting, Ullman v. United States, 350 U.S. 422, 434, 76 S.Ct. 497, 504, 100 L.Ed. 511 (1956). In the instant context, as explained above, we do not need to rely on recitations by the district court to insure statutory compliance but instead can look to the affidavit submitted by the government in support of its request for electronic surveillance
 
 
 [6]
 Order No. 1088-85 of March 28, 1985 was attached to the October 24, 1985 application for electronic surveillance. This order, signed by Attorney General Edwin Meese, specially designated, inter alia, the Assistant Attorney General in charge of the Criminal Division to authorize applications for the interception of wire or oral communications. There is no contention on appeal that this order did not adequately vest Stephen Trott with the power to authorize an application for electronic surveillance
 
 
 [7]
 The four appellants not charged with Hobbs Act violations were Traitz., Jr., Hurst, Daly and Nuzzi
 
 
 [8]
 The government did not contest the jury instruction on the Enmons defense. Therefore, for the purpose of this appeal, we will assume without deciding that the appellants were entitled to the Enmons instruction in the first instance
 
 
 [9]
 It should be noted that the simple invocation of the advice of counsel defense does not automatically insulate a defendant from liability. Where the advice of counsel is properly invoked it becomes a "matter to be considered by the jury in determining the appellants' guilt." United States v. Thaggard, 477 F.2d 626, 632 (5th Cir.), cert. denied, 414 U.S. 1064, 94 S.Ct. 570, 38 L.Ed.2d 469 (1973)
 
 
 [10]
 For the purposes of analysis, we will again assume without deciding that Enmons is applicable. Similarly, in examining the propriety of the jury charge on the advice of counsel defense we are assuming without deciding that the defense was applicable in the first instance
 
 
 [11]
 Because we conclude that the jury charge on the advice of counsel defense was proper, appellants' contention that the district judge should have adopted their proposed charge is meritless. "It is well settled that there is no error to refuse to instruct as counsel wishes if the charge to the jury is correct." United States v. Blair, 456 F.2d 514, 520 (3d Cir.1972) (citations omitted)
 
 
 [12]
 Under 18 U.S.C. Sec. 1961(5) a "pattern of racketeering requires at least two acts of racketeering, one of which occurred after the effective date of this chapter and the last of which occurred within ten years ... after the commission of a prior act of racketeering."
 
 
 [13]
 The Pennsylvania Bribery statute, 18 Pa.C.S. Sec. 4701 provides, in pertinent part, as follows:
 (a) Offenses defined.--A person is guilty of bribery, a felony of the third degree, if he offers, confers or agrees to confer upon another, or solicits, accepts, or agrees to accept from another;
 (1) any pecuniary benefit as consideration for the decision, opinion, recommendation, vote or other exercise of discretion as a public servant, party official or voter by the recipient;
 (2) any benefit for consideration for the decision, vote, recommendation or other exercise of official discretion by the recipient in a judicial, administrative or legislative proceeding; or
 (3) any benefit as consideration for a violation of a known legal duty as public servant or party official.
 
 
 [14]
 The New Jersey Bribery statute, N.J.S.A. Sec. 2C:27-2, provides, in relevant part, as follows:
 A person is guilty of bribery if he directly or indirectly offers, confers or agrees to confer upon another, or solicits, accepts or agrees to accept from another;
 a. Any benefit as consideration for a decision, vote, recommendation or exercise of discretion of a public servant, party official or voter on any public issue or in any public election; or
 b. Any benefit as consideration for a decision, vote, recommendation or exercise of official discretion in a judicial or administrative proceeding; or
 c. Any benefit as consideration for a violation of an official duty of a public servant or party official; or
 d. Any benefit as consideration for the performance of official duties.
 
 
 [15]
 18 U.S.C. Sec. 1962(c) provides: "It shall be unlawful for any person employed or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."
 
 
 [16]
 Section 1952 of 18 U.S.C., provides in pertinent part:
 (a) Whoever travels in interstate commerce or uses any facility in interstate or foreign commerce, including the mail with intent to
 * * *
 (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any unlawful activity,
 * * *
 (b) As used in this section "unlawful activity" means
 * * *
 (2) extortion, bribery, or arson in violation of the laws of the State in which committed in of the United States.
 
 
 [17]
 The jury charge on the essential elements of bribery under Pennsylvania and New Jersey law was given as follows:
 Here are the elements of bribery.
 First, that the defendant offered, conferred or agreed to confer a benefit upon another person.
 Second, that the benefit was intended to be consideration for the decision, opinion, recommendation, vote or other exercise of discretion of a public servant or that the benefit was intended to be considered for a violation of a known legal duty.
 Third, that the defendant performed those acts knowingly or willfully.
 Thus, any contention by appellants that the district judge failed to charge the jury using the "in consideration for" language found in the relevant bribery statutes is meritless as a matter of fact.
 
 
 [18]
 It should be noted that instead of using the words "official duty" the Pennsylvania statute uses the words "known legal duty". Compare 18 Pa.C.S. Sec. 4701(a) with N.J.S.A. 2C:27-2. This distinction is irrelevant to the issues raised on appeal and the phrases will therefore be used interchangeably
 
 
 [19]
 It should be noted that Martinez limited and called in question the reasoning of McCallum v. State, 686 S.W.2d 132 (Tex.Cr.App.1985), cited by appellants. Thus, McCallum has little value as persuasive authority
 
 
 [20]
 Interpretations of the Pennsylvania bribery statute are particularly persuasive for construing the New Jersey statute in that both were adopted without substantial relevant modification from Sec. 201.1 of the Model Penal Code and therefore, as appellants concede, are virtually identical
 
 
 [21]
 It should be noted that the case of United States v. Danskar, 537 F.2d 40 (3d Cir.1976), cited by one of the appellants in a supplemental brief, does not support the appellants' case. In Danskar this Court examined a precursor to the current New Jersey bribery statute--the former statute being different in several material but not presently relevant ways--stated:
 The [New Jersey bribery] statute does not make criminal an agreement to influence, in an otherwise lawful manner, governmental action unrelated to his office.... Rather, in order to establish a violation of the statute, it must be demonstrated ... that he agreed to exert that influence in a manner which would undermine the integrity of the public action....
 Thus, Danskar does not stand for the proposition that an agreement is required to find criminal liability. Instead the case stands for the notion that where an agreement is found it must be to engage in an otherwise unlawful act.
 
 
 [22]
 Counts 42 and 43 of the superseding indictment charged Traitz, Jr. with having violated Sec. 894 through his efforts to collect debts owed to Nicodemo Scarfo. Appellant Traitz, Jr. does not argue on appeal that the evidence was insufficient as to his conviction on these counts
 
 
 [23]
 For the purposes of this argument we will assume that it was proper to charge the jury on the Enmons defense in the context of the Hobbs Act
 
 
 [24]
 After the tape in which this statement is contained was played to the jury, the district judge stated, "this statement is hearsay and it is stricken. It is evidence you should not consider in any way, shape or form."
 
 
 [25]
 Medina contends that hearsay evidence was improperly admitted implicating him as the driver of the hit-and-run vehicle. We find that the introduction of this evidence was, if error, harmless. This fact was established beyond realistic dispute by the introduction of other evidence. First, an eyewitness identified Medina in court as the driver of the hit-and-run vehicle. Second, a tape recording was introduced into evidence in which Medina admitted to Traitz, Jr. that he had been involved in the hit-and run accident and that at the time of the accident he both had a gun in the car and was under the influence of alcohol. Third, evidence was admitted that Medina was convicted in a Pennsylvania state court proceeding for having been involved in the hit-and-run. Given all this evidence any error which might be said to have occurred is properly found to be harmless