UNITED STATES of America

v.

Ernest WILLIAMS.

CR. A. No. 86–00451–09.
Civ. A. No. 91–1546.

United States District Court,
E.D. Pennsylvania.

May 24, 1991.

---

Ernest Williams, pro se.

Louis R. Pichini, Asst. U.S. Atty., Philadelphia, Pa., for U.S.

## MEMORANDUM

KATZ, District Judge.

This is the first attempt to seek post conviction relief in the so-called roofers' case which I tried in 1987.

Mr. Williams has petitioned this court to vacate his judgment of conviction and sentence. Defendant argues that he was denied effective assistance of counsel, that prosecutorial misconduct deprived him of a fair trial, that various jury instructions by the trial court were in error, and that recent enactment that extends the life of the United States Parole Commission is a prohibited *ex post facto* law.

For the reasons set forth in this memorandum, Mr. Williams' motion is without merit and is denied.

On September 13, 1985, the court authorized the installation of listening devices for the interception of communications in the Business Manager's Office and Business Agents' Meeting Room at the offices of Roofers Union Locals 30/30B for thirty days pursuant to 18 U.S.C. § 2510 *et seq.* Electronic surveillance commenced on September 26, 1985, and, after four extension orders, was terminated on February 20, 1986.

On October 23, 1986, Mr. Williams and eighteen other individuals were indicted on RICO, RICO conspiracy, Hobbs Act extortion, and collection of credit and claims by extortionate means.

On March 31, 1987, Mr. Williams and his co-defendants filed motions to suppress the electronic surveillance. An evidentiary hearing on this motion to suppress was held on June 25, 1987, and the district court denied the motion on June 25, 1987.

On June 18, 1987, the grand jury returned a superseding indictment charging Mr. Williams and his codefendants with the

same violations of law that were charged in the original indictment. Trial on these commenced in September 1987. On November 23, 1987, Mr. Williams was convicted on counts 1, 2, 24, 31, 41, 45, and 61 of the superseding indictment, for RICO conspiracy, RICO, Hobbs Act extortion, and collection of credit and claims by extortionate means.

I sentenced Mr. Williams on March 4, 1988 to nine years imprisonment and five years probation. On March 22, 1989, the district court's judgment was affirmed by the Third Circuit Court of Appeals, in *United States v. Traitz*, 871 F.2d 368 (3d Cir. 1989). The Supreme Court denied certiorari. —— U.S. ——, 110 S.Ct. 78, 107 L.Ed.2d 44 (1989).

Mr. Williams later filed a motion, *pro se*, for reconsideration of his sentence, which was denied by the district court on January 18, 1990. This *pro se* motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 was filed on March 11, 1991. A motion for leave to amend this motion was granted on April 18, 1991.

In 1985, Mr. Williams was a business agent in Philadelphia for Roofers Union Locals 30 and 30B. Evidence presented at trial showed that certain members of the Union, including Mr. Williams, were engaged in a scheme to extort money from members of the Union which was not legally due under the Union contract. Mr. Williams' role in this scheme was that of an enforcer. He threatened, intimidated, and struck Union members as part of an overall scheme to extort money from those members.

Conduct in furtherance of the scheme occurred regularly from September through November 1985. Typically, a roofing contractor was summoned to the Union offices and escorted to the Business Agents' Meeting Room, dubbed the "rubber room." The contractor would be accused of underreporting hours in remittance reports that were submitted to the Union. Because payments due the Union from contractors were tied to the number of hours reported in the remittance reports, a contractor who underreported hours would be cheating the Union out of money. Contractors were threatened with physical harm or beaten. Later in these meetings, the contractor would be informed that he would have to begin reporting 100 hours of work each month for himself in his remittance reports, thereby requiring a $60 monthly payment to the Union.

Some of the evidence showing Mr. Williams' involvement in this scheme is illustrative. On September 26, 1985, Dan Carr, then owner of the Danny Carr Roofing Company, was instructed by the Union that he needed personally to appear at the Union offices to pick up stickers that showed he was a Union contractor. Exhibit 2, Tr. 207. Once at the Union offices, Mr. Carr was summoned to the Business Agents' Meeting Room. He was directed to a particular chair. *Id.* Tr. 210–11. Three individuals, Michael Mangini, Robert Crosley and Richard Schoenberger (each co-defendants of Mr. Williams), began questioning Carr harshly about the remittance reports he had submitted to the Union. They claimed he was not accurately representing his hours for the Union. *Id.* Tr. 213–16. During this meeting, Williams came into the meeting room. He stood behind Carr and struck him twice with an open hand. *Id.* 216–17.

Carr testified that during this meeting he was afraid and upset. *Id.* 215–16. He was told he would be expected to report on the monthly remittance forms indicating that he and his brother, who worked with Carr, had each worked 100 hours regardless of whether or not he actually worked. *See id.* Tr. 217. This would, in turn, trigger a $120.00 monthly payment to the union. When he left this meeting, Carr was told by Crosley, "[Y]ou are lucky you are getting away with just a slap in the head. Next time it won't be as easy." *Id.* Tr. 220. Carr testified that he subsequently filed remittance reports that consistently reported 100 hours of work for himself and his brother when in fact he and his brother did not work that many hours. *Id.* Tr. 222–25.

Allen Huntbach testified that in September 1985 he was a member of the Roofers

Union but was working part time as a non-union roofing contractor. As a non-union contractor he was not reporting his hours or those of his employees to the Roofers Union. *Id.* Tr. 817–18. On November 26, 1985, Huntbach was instructed by Mark Osborn (also a codefendant of Williams) to come to the Union offices. *Id.* Tr. 818. Once there, Huntbach, like Carr, was taken to the Business Agents' Meeting Room. He met with Osborn and Williams. He was informed that he could not operate as a contractor unless he affiliated with the Union. Huntbach testified that he was struck twice in the head during this meeting, once from behind. *Id.* At least one of these blows was delivered by Mr. Williams.

Defendant argues that he received ineffective assistance from his trial counsel and thus was denied a fair trial. In *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), the Supreme Court established a two-part test for ineffective assistance of counsel. The defendant must show, first, that counsel's performance was deficient, and, second, that the deficient performance prejudiced the defense. 466 U.S. at 687, 104 S.Ct. at 2064. The court held that attorney performance under this standard is to be measured by "reasonableness under prevailing professional norms." 466 U.S. at 688, 104 S.Ct. at 2065.

■ Defendant was charged in Count One of the superseding indictment in this case, along with his twelve co-defendants, with conspiracy to violate the RICO statute. It is well settled that the provisions for joinder of defendants under Rule 8(b) of the Federal Rules of Criminal Procedure are satisfied where an indictment charges a single conspiracy. Courts ordinarily have held that a joint trial is appropriate and severance should not be granted under Rule 14 of the Federal Rules of Criminal Procedure where the defendant is charged jointly with others in a conspiracy count. Moreover, "defendants are not entitled to severance merely because the evidence may be more damaging against a co-defendant and there is a danger of spillover." *United States v. DiPasquale*, 561 F.Supp.

1338, 1347 (E.D.Pa.1983), *aff'd*, 740 F.2d 1282 (3d Cir.1984), *cert. denied*, 469 U.S. 1228, 105 S.Ct. 1226, 1227, 84 L.Ed.2d 364 (1985).

I would certainly have denied a motion for severance by this defendant. Nor is there a reasonable probability that the result of the case would have been different if this defendant had been tried alone. The jury could reasonably be expected to compartmentalize the evidence against Mr. Williams. I tried 13 union people together. I did sever the 2 lawyers and I also severed the 3 alleged organized crime people.

Second, defendant claims that the ineffectiveness of his trial counsel is shown by counsel's failure to request limiting instructions from the district court regarding multiple conspiracies. However, the district court gave a proper limiting instruction on multiple conspiracies, and thus Mr. Williams can show neither that his counsel's decision was unreasonable in this regard, nor that he was prejudiced by this decision.

■ Third, defendant argues that his counsel should have moved for a mistrial because a juror "had a nervous breakdown during trial and was taken on a guided tour to the Philadelphia zoo to look at elephants, donkeys, and other animals." Br. at 12. The incident to which Mr. Williams appears to be referring involved a juror whom the Marshal reported had returned to her room crying. Questions were raised by defense and government counsel regarding whether the juror was under medication and whether she was capable of continuing as a juror. Exhibit 3, Tr. 2–3. The juror was examined by a physician, who reported at an in camera hearing with all counsel present. As I later found:

> [The doctor's] report was that the juror was fine. She was able to concentrate. She had no trouble sleeping. Her appetite was good. She was logical. She was cooperative. She wanted to stay and finish her task in deliberations. She wanted to continue because she felt it was her civic duty. She felt capable of continuing.

The Doctor expressed his view without qualification that the juror was able to continue. There was really no question raised at the in camera hearing with regard to the ability of the juror to continue after hearing Dr. Schwartz's testimony.

*Id.* Tr. 27–28.

Under these circumstances, there is no support for Mr. Williams' claim that his counsel was ineffective for failing to move for a mistrial. Any such motion would have been denied by me.

Besides these three specific points, defendant bases his claim of ineffective assistance on a bald assertion that his counsel's "pretrial investigation was lacking, his performance during trial, his actions concerning jury instructions, his assistance during sentencing, produced such results that petitioner would have been better off with no counsel at all." Br. at 12.

In fact, a review of the record in this case shows that the representation provided by defendant's counsel was not "ineffective" within the meaning of *Strickland.* He cross examined at length the witnesses who most incriminated the defendant. His cross examinations and his closing argument, *Id.* Tr. 3549–81, evidenced a thorough understanding of the case and presented a clear theory of defense: that Mr. Williams was a good union man who believed the individuals named above were cheating the union in some way. At sentencing, Mr. Williams' counsel raised a number of points regarding the presentence report, and was successful in getting a portion of that report stricken. All in all, this record shows that Mr. Williams' counsel was effective. Defendant's conclusory assertions to the contrary do not demonstrate to the contrary.

Mr. Williams also claims that misconduct by the prosecutor denied him a fair trial. He asserts that the government "fabricated evidence," concealed favorable *Jencks* and *Brady* material, used perjured testimony, misbehaved at counsel table in front of the court, and "targeted trade unions under a secret directive mandated by the Reagan administration." Each of these allegations is frivolous.

Mr. Williams appears to argue that the electronic surveillance of Union offices was unjustified and the evidence derived from this evidence should have been suppressed. This issue was raised and argued in both the district court and the Court of Appeals for the Third Circuit, *see United States v. Traitz*, 871 F.2d 368, 376–80. Mr. Williams has provided no reason why he decisions of those courts should be reconsidered.

Mr. Williams also claims that witness Carr gave false testimony. Indeed, Mr. Williams goes so far as to assert that Carr was never assaulted, Br. at 16, but the evidence showing that such an assault took place is uncontradicted.

■ Mr. Williams does not cite a single instance where the government withheld *Jencks* and *Brady* material. Such conclusory allegations cannot satisfy Williams' burden of demonstrating that he was denied a fair trial.

■ Mr. Williams finally cites a series of instances in which the prosecutor allegedly gave inaccurate statements on the law during opening and closing arguments. Br. at 16–17. Even if any such misstatements were made, however, they clearly were harmless, as the jury was instructed that they should rely on the law as we told them by the district court. *See* Exhibit 2, Tr. 3827. Indeed, at the end of his closing argument government counsel himself stressed to the jury "[L]ook at the facts and listen carefully to Judge Katz's instructions. What Judge Katz says about the law controls.... Focus on what Judge Katz tells you on the elements of the offenses." *Id.* Tr. 3303–04.

■ Defendant challenges a variety of instructions to the jury by the district court. Except for certain Hobbs Act instructions, none of the instructions challenged by Mr. Williams were objected to at the time of trial or on appeal, and thus can provide grounds for a new trial on collateral attack only in the most extraordinary of circumstances, where the defendant shows that an alleged error "worked to his

**1024**

actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 1596, 71 L.Ed.2d 816 (1981). A review of the instructions challenged by defendant shows that they were proper, and did not rise to the level of error required by *Frady*.

First, defendant appears to claim that the district court gave an inadequate jury instruction concerning the need to focus on the evidence and charges regarding each defendant individually. Br. at 17–18. In this regard this district court instructed the jury:

> A separate charge or offense is charged in each of the counts in the indictment. Each charge, and the evidence pertaining to it, must be considered separately. The fact that you find one defendant [guilty] or not guilty as to one of the offenses charged should not control your verdict as to any other offense charged or as to any other defendants. You are here to determine the guilt or innocence of each of the defendants individually from the evidence in the case.

Second, defendant appears to claim that the charge regarding the government's burden of proving each element of the offenses charged beyond a reasonable doubt was in error. Br. at 18. The district court instructed the jury on this issue, in part, as follows:

> The Government has the burden of proving each defendant guilty beyond all reasonable doubt. A defendant must never be convicted on mere suspicion or conjecture. Therefore, if you are not convinced that the Government has proved the defendant guilty beyond a reasonable doubt on each and every element or ingredient of the offense charged, you must acquit the defendant.

> .    .    .    .    .

> The defendants [have] pleaded "not guilty" to all of the charges contained in the indictment. This plea puts in issue each of the elements of the offenses as described in these instructions, and imposes on the Government the burden of establishing each of the elements of proof beyond a reasonable doubt.

Third, defendant appears to claim that the district court erred in instructing the jury regarding Hobbs Act extortion. Br. at 18. The district court gave a lengthy instruction on Hobbs Act extortion. *Id.* Tr. 3888–99. Several parts of this charge were challenged before the Third Circuit on appeal. The district court's charge was upheld on appeal. Mr. Williams' vague assertion that the charge was in error does not provide any basis for reconsidering that decision.

Finally, defendant argues that the district court gave an inadequate instruction concerning multiple conspiracies. Br. 18–19. A review of the multiple conspiracy instruction given to the jury, however, shows no error. The court instructed the jury, in part:

> In this case, some of the defendants contend that the Government's proof fails to show the existence of only one overall conspiracy. Rather, they claim that, if anything, there were actually several separate and independent conspiracies with various groups of members. Other defendants deny there's any conspiracy at all.

> Whether there existed a single unlawful agreement or many such agreements, or indeed, no agreement at all, is a question of fact for you, the jury, to determine in accordance with the [instructions] that I've given you and that I'm about to give you.

> .    .    .    .    .

> If you find that the conspiracy charged in the indictment did not exist, you cannot find any defendant guilty of the single conspiracy charged in the indictment. This is so even if you find that some conspiracy other than the one charged in this indictment existed, even though the purposes of both conspiracies have been the same and even though there may have been some overlap in membership.

> By the same token, if you find that a particular defendant was a member of another conspiracy, not the one charged

in the indictment, then you must acquit the defendant of the conspiracy charged.

■ The defendant also contends in his amended filing that Public Law 101–650, § 316, 104 Stat. 5115 (1990), which extends the life of the United States Parole Commission for five years, amounts to an *ex post facto* law prohibited by article I, section 9, clause 3 of the United States Constitution. The *ex post facto* prohibition forbids Congress from enacting any law "which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." *Weaver v. Graham,* 450 U.S. 24, 28, 101 S.Ct. 960, 964, 67 L.Ed.2d 17 (1981), quoting *Cummings v. Missouri,* 4 Wall. 277, 325–26, 18 L.Ed. 356 (1867). Because the extension of the life of the Parole Commission does not in any way impose additional "punishment" on the defendant, it cannot be deemed an *ex post facto* law. *See United States v. Miller,* 753 F.2d 19, 21 (3d Cir.1985) ("The ex post facto prohibitions of the Constitution ... apply only to laws which impose 'punishment'.").

The Sentencing Reform Act of 1984 (the "Act"), Pub.L. No. 98–473, 98 Stat.1987, which revised the federal sentencing process as a whole, provided that the United States Parole Commission would be abolished five years after the effective date of the Act, that is, on November 1, 1992. During the period before its expiration, the Parole Commission "was authorized to deal with sentences imposed under the pre-Act practices and the lengths of sentences, parole and good time statutes would remain in effect as to any individual sentenced before the new Act." *United States ex rel. D'Agostino v. Keohane,* 877 F.2d 1167, 1171 (3d Cir.1989).

As originally enacted, section 235(b)(3) of the Act directed that the Parole Commission, before its expiration on November 1, 1992, set a release date for pre-Act prisoners who would still be incarcerated at that time. As the Second Circuit noted in *Romano v. Luther,* 816 F.2d 832, 839–40 (1987): "The subsection is a 'winding-up' provision that will provide the certainty of release with the appropriate guideline range to those for whom the Parole Commission, prior to is abolition, might otherwise have either taken no action or set a parole date beyond their guideline ranges." As now amended by Pub.L. 101–650, section 235(b)(3) directs the Parole Commission to set a release date for pre-Act prisoners who are still incarcerated at the time of the Commission's new expiration date of November 1, 1997.

The five-year extension provided by Pub.L. 101–650 clearly is only a procedural change in the process of setting release dates for pre-Act prisoners and this does not present any *ex post facto* issue. *See Weaver v. Graham,* 450 U.S. 24, 29 n. 12, 101 S.Ct. 960, 964 n. 12 ("no *ex post facto* violation occurs if the change is merely procedural, and does 'not increase the punishment nor change the ingredients of the offense of the ultimate facts necessary to establish guilt.'", quoting *Hopt v. Utah,* 110 U.S. 574–590, 4 S.Ct. 202, 210, 28 L.Ed. 262 (1884)); *Dobbert v. Florida,* 432 U.S. 282, 293, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344 (1977) ("Even though it may work to the disadvantage of a defendant, a procedural change is not *ex post facto.*") The amended version of section 235(b)(3), as with the prior version, is merely a "housekeeping provision," designed to ensure that release dates are set by the Parole Commission for pre-Act prisoners before the Commission itself expires. *See Piekarski v. Bogan,* 912 F.2d 224, 225 (8th Cir.1990). It does not alter the parole guideline range the defendant faces, or make it more likely that the defendant's actual release date will be later than it would be under the prior provision.

The remainder of defendant's claims are frivolous and require no further discussion.